897 So.2d 207 (2004)
Karen BRACKIN
v.
TRIMMIER LAW FIRM, Alabama Credit Union League, and Jo Lynn Rutledge.
Family Security Credit Union
v.
Karen Brackin.
1021005 and 1021593.
Supreme Court of Alabama.
May 28, 2004.
As Modified on Denial of Rehearing September 10, 2004.
Order Overruling Rehearing Applications and Statement of Nonrecusal September 10, 2004.
*208 Thomas E. Baddley, Jr., and Jeffrey P. Mauro of Baddley & Mauro, LLC, Birmingham; and Terry L. Butts of Cervera, Ralph & Butts, Troy, for appellant/cross-appellee Karen Brackin.
James N. Nolan and Anu M. Brady of Walston, Wells, Anderson & Bains, LLP, Birmingham, for appellant Family Security Credit Union, and appellees Alabama Credit Union League and Jo Lynn Rutledge.
Ronald G. Davenport and R. Austin Huffaker, Jr., of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for appellee Trimmier Law Firm.
William H. Pryor, Jr., atty. gen., Nathan A. Forrester, deputy attorney. gen., and Scott L. Rouse, asst. atty. gen., for amicus curiae State of Alabama, in support of the appellant Family Security Credit Union.
Lee H. Copeland and Mitchel H. Boles of Copeland, Franco, Screws & Gill, P.A., Montgomery, for amicus curiae Alabama *209 Bankers Association, in support of the appellant Family Security Credit Union.
James N. Nolan, Anu M. Brady, and Kary Bryant Wolfe of Walston, Wells, Anderson & Baines, LLP, Birmingham, for appellant Family Security Credit Union and appellees Alabama Credit Union League and Joy Lynn Rutledge, on applications for rehearing.
Lee H. Copeland and Mitchel H. Boles of Copeland, Franco, Screws & Gill, P.A., Montgomery, for amicus curiae Alabama Bankers Association, in opposition to Karen Brackin's recusal motion, on applications for rehearing.
STUART, Justice.
In case no. 1021005, Karen Brackin appeals from judgments entered in favor of the Trimmier Law Firm, Alabama Credit Union League, and Jo Lynn Rutledge. We affirm those judgments.
In case no. 1021593, Family Security Credit Union ("FSCU") appeals from a judgment entered in favor of Brackin, a former FSCU employee. After a jury trial, a Morgan County jury awarded Brackin $800,000 in compensatory damages and $200,000 in punitive damages on her defamation claims based on certain statements made by Brackin's former co-employees to an auditor during an investigation performed at FSCU following a finding of improprieties during an audit. FSCU appeals from the judgment entered on the jury's verdict. We reverse and remand.

Background
In April 1999, an audit of FSCU identified apparent improprieties in the files at FSCU related to a former employee of FSCU, Mitchell Smith.[1] As a result of finding these apparent improprieties, Alabama Credit Union Administration ("ACUA")[2] issued to FSCU a "Document of Resolution," referred to as a "DOR." This DOR directed FSCU's supervisory committee to "engage an outside firm to confirm the entries listed in the supplemental facts section of this report and any other related activity discovered during the review." The "supplemental facts section" of the DOR referred to potential lending violations and other improprieties by Smith. The DOR also instructed FSCU to "provide your findings to the Alabama Credit Union Administration, ACUA, and National Credit Union Administration, NCUA."
FSCU retained Steve Trimmier, the senior partner with the Trimmer Law Firm, to conduct the investigation. The Trimmier Law Firm was FSCU's legal counsel. In turn, the Trimmier Law Firm retained Jo Lynn Rutledge, a certified public accountant employed with the Alabama Credit Union League ("ACUL")[3] as the director of its auditing department, to conduct the investigation of Smith's activities at FSCU.
*210 Rutledge had previously audited FSCU, performing routine annual audits at FSCU beginning as early as 1994 or 1995. She reported the results of each of those previous audits directly to the supervisory committee of FSCU. Rutledge audited FSCU during those years in which Smith's wrongful activities went undiscovered.
Brackin was the manager of lending, marketing, and human resources at FSCU, second in command only to Ron Fields, the president at FSCU. It was undisputed that, at various times throughout her employment with FSCU, Brackin had advised Fields when certain loan officers were not following the policies, procedures, or recommended lending practices of FSCU. Fields acknowledged that Brackin initially discovered and reported to him the violations and improprieties involving Smith.[4]

The 1999 Audit
Rutledge spent September 8, 9, and 10, 1999, at FSCU. Fields, Brackin, and several other FSCU employees were attending an out-of-state conference during that time. On September 9, while reviewing computer reports at FSCU, Rutledge noticed that the due dates on several loans originated by Smith had been "advanced."[5] The computer reports indicated that John Salter and Ann McMillan were the loans officers who had entered the new due dates into the computer. Rutledge questioned Salter and McMillan; they both explained that Brackin had instructed them to change the due dates and that she did so often. At that point, Salter suggested that Rutledge speak with Rolanda Johnson, another FSCU employee, about Brackin.[6]
By the end of the day on September 10, Rutledge had spoken to FSCU employees John Salter, Ann McMillan, Rolanda Johnson, Tanya Drain, Bobby Chitwood, Dennis Smith, and Debra McCaghren concerning Brackin. Rutledge claimed that "[a]s I spoke to one, they referred me to another with issues related to Karen Brackin." Rutledge instructed the employees to reduce their statements to writing. Those writings were unsworn.
Rutledge testified that she "felt an urgency" to discuss with someone the statements made to her about Brackin. When she could not reach Steve Trimmier, she contacted Lloyd Moore, the senior examiner with the ACUA, to discuss what she had been told by the FSCU employees.[7] She did not attempt to contact any member of the FSCU supervisory committee, although that was her usual reporting procedure.
Rutledge then prepared a written summary of the information she learned about *211 Brackin during her audit of FSCU. In her report, Rutledge wrote:
"I was at [FSCU] on September 8, 9, and 10th of 1999 to further research items related to loans made by Mitchell Smith. In review of loans made to a number of related parties of [W.G.], I noted that due dates had been file-maintained[8] resulting in the advancing of the due dates of these loans. User number 148, Ann McMillan, and 146, John Salter, were noted as having performed the file maintenance. In most instances, no extension agreements were noted in the loan files. In a few instances, extension agreements were noted in the loan files that were neither signed by the member or approved by the credit committee. Upon questioning, John Salter and Ann McMillan stated that they had both advanced these due dates solely at the direction of Karen Brackin. Per both John and Ann, Karen would ask for a delinquent loan report and call a meeting at mid-month. She would then direct the attention of both employees to loans, some with large balances, on which she wanted the due date advanced with statements such as `don't let this one hit us.' I asked both of these employees if there were any other instances in which Karen Brackin had directed them to advance due dates without the approval of the credit committee. Both employees directed me to family members of Karen Brackin. I did note that due dates had been advanced on [Leroy T., J.T., Larry T. and W.G.B.]. The loan files of [Leroy T., J.T., and Larry T.] were reviewed and copied. No extension agreements were noted in these files. The loan file of [W.G.B.] could not be located. It is my understanding that all extension agreements must be approved by the credit committee. Both Ann McMillan and John Salter informed me they are now refusing to advance due dates when directed to do so by Karen Brackin. A report of file maintenance to due dates for the period of 1997 through 1999 was obtained from the data processing department and is 99 pages long.
"In addition, loan proceeds of $150,000 were recently disbursed on an Equity Express line of credit to [D.T.], another related party of Karen Brackin. The loan file of [D.T.] could not initially be located at the credit union. Conversations with Rolanda Johnson and John Salter regarding this loan revealed the following. Karen Brackin instructed Rolanda Johnson, in the presence of John Salter, to take the $150,000.00 proceeds check for the loan to the attorney's office and to carry the loan file with her as though she was taking the loan documentation to be signed. She also instructed Rolanda to `not take the loan file into the attorney's office' but to return it to her when she returned to the credit union at which time, Karen told Rolanda that if anyone asked her where the documentation was to state that she did not know. The loan documentation was therefore unsigned at the time the proceeds were disbursed and this was known to Karen Brackin. She also told Rolanda to call the attorney and inform him that this was a `cash deal' approximately one week before the check was disbursed. Karen Brackin had a phone conversation with Rolanda while I was at the credit union and informed Rolanda that the loan file was in the trunk of her car.[9] I have been *212 told that the maximum amount of Equity Express loans is $50,000.00. All business purpose loans are supposed to be approved by Ron Fields. This loan file was subsequently found by Ron Fields and Ernestine McDonald in the bottom of one of the drawers in Karen Brackin's office and all documentation was unsigned.[10]
"Another loan on which I believe the proceeds were disbursed prior to the documentation being signed by the member is a $259,000.00 loan to [M.A. and A.A.][11] This loan file is missing and apparently has been for some time. Rolanda and John Salter do remember witnessing the members sign the documentation while standing at Rolanda's desk but feel certain that it was approximately ten to fourteen days after disbursement of the proceeds of the loan. Rolanda also indicated that the member's signature card was signed at that time. Rolanda has contacted an attorney to ascertain what action she should take.[12] Don Tucker processed this loan, once for [A.A.] and a second time for [A.A. and M.A.] [A.A.] qualified for a lower loan rate as `B' paper, [M.A.] did not qualify for this rate as `D' paper[;] however, Karen Brackin instructed that the loan was to be made at the lower rate. The credit union received the title from the member's [sic] on September 21, 1999; however, the member's [sic] have indicated that they did not receive copies of any of the original loan documentation.
"Another loan has been made to [M.A. and A.A.] as instructed by Karen Brackin [;] however, the loan officer, Connie Drane, provided the loan documentation to Karen Brackin for her approval and has been unable, despite repeated requests, to obtain the loan documentation.
"Apparently, Karen Brackin has asked Connie Drane, Bobby Chitwood and other loan officers to make loans outside of loan policy on more than one occasion. Connie Drane had a file of loans on her desk that she had retained copies of after Karen Brackin had insisted that she make the loan and then forward the documentation to her, Karen Brackin, for her approval. Connie Drane has not been able to obtain these loans to ascertain they were approved after she was required to book them. There has been some dispute regarding sick leave used for a child where Connie Drane is concerned and she has consulted an attorney and submitted her notice to the credit union. She has also discussed with the attorney the loans she was asked to make outside of policy and has maintained documentation to support her position. After the disagreement regarding the sick leave, employee handbooks were taken away from the lending staff by Barbara Ricks at the instruction of Karen Brackin and without being provided new handbooks. In *213 addition, Connie Drane was shown a page of `policy' that she had never seen before and that had not been in the employee handbook, again by Barbara Ricks at the instruction of Karen Brackin. No new employee handbook had been provided to lending staff as of this report[;] however, a copy was obtained from a different department for review. Connie Drane informed me that she had turned in her notice because Karen Brackin had continuously asked her to do things outside of loan policy.
"Loan officer Bobby Chitwood also informed me that he had been instructed to make a loan that was clearly outside of loan policy by Karen Brackin, shortly after the lending staff had received additional training from Karen Brackin and Ron Fields, instructing the lending staff in no uncertain terms that they were not to make loans outside of policy. More than one employee indicated to me that the atmosphere of the training at the hands of Karen Brackin and Ron Fields was hostile and ludicrous considering it was Karen Brackin who was requiring the loan officers to make loans outside of policy. Bobby Chitwood refused to make the loan, has consulted an attorney and has made copies of documentation to support his position.
"I have been informed that most employees of the loan department have been asked by Karen Brackin to make loans outside of loan policy. The employees expressed reluctance to discuss the situation with Ron Fields because the perception is that any employee going to Ron Fields about Karen Brackin will be harassed by Karen Brackin until they quit. Both Ann McMillan and John Salter have the same perception. Cheryl [Patterson] was questioned and supported all that the other employees had stated. I was also informed that at least one employee had been told by Mitchell Smith that Karen Brackin was requiring him to make loans outside of policy. This would explain the fact that Karen Brackin was requiring the collections staff to advance due dates on loans related to [W.G.] without the knowledge of the credit committee and in an effort to keep these loans from appearing on the delinquent loan report.[13] This could materially damage the credit union's case against Mitchell Smith in that they continue to employ the supervisory employee who, at least in some instances, instructed Mitchell Smith to make these loans. It also raises questions as to who removed the loan files that we have determined are missing since Karen Brackin has instructed other employees to make loans outside of policy as well and at least two of these files are not to be found on the credit union premises.
"The credit union employees questioned also informed me that Karen Brackin was frequently known to have gone to unoccupied offices and performed transactions on other employees terminals under their user number.
"....
"We have spoken with, at this point in time, the following employees. Three employees, Rolanda Johnson, Bobby Chitwood, and Connie Drane have all consulted attorneys for their own protection. Additional information regarding the above situations is included in the attached statements by the employees marked by an asterik [sic].
"John Salter*
"Ann McMillan*

*214 "Bobby Chitwood*
"Connie Drane
"Rolanda Johnson*
"Cheryl Patterson*
"Chuck Cushing*
"Bonnie Teichmiller*
"Barbara Ricks*
"Don Tucker*
"Dennis Smith*
"Teresa Willingham
"John Young
"Tina Hall*
"Meleah Seagars"
Rutledge testified that she attempted to contact Steve Trimmier again on Monday, September 13, but that she could not reach him. She finally spoke with Trimmier on Wednesday, September 15. On that same day, ACUA administrator Glen Latham contacted Fields and instructed Fields to suspend Brackin from her employment immediately, pending a full investigation.[14] Fields notified Brackin that she was suspended as of September 15, 1999; he was instructed to, and did, take her office keys from her. Brackin claims that Fields did not inform her of the reason for her suspension; she also claims that he did not provide her with an opportunity to respond to the charges made against her.[15]
Rutledge provided the Trimmier Law Firm with a copy of her written report; she denies providing anyone else with her report. She claims that she spoke only with Lloyd Moore and with Steve Trimmier regarding Brackin.
On September 16 and 17, Latham, Moore, Steve Trimmier, and Rutledge met with Earnestine McDonald, chairperson of FSCU's board of directors; Ken Livingston, chairperson of FSCU's supervisory *215 committee; and Fields at FSCU's office in Decatur.[16] At these meetings, they questioned approximately a dozen FSCU employees about the information the employees had provided to Rutledge. During this same time period, Brackin's office was searched; several of the missing loan files were located in her office. At least one of those loan files contained unexecuted loan documents relating to loans made to Brackin's relatives.
On December 2, 1999, the ACUA notified Brackin and her attorney that a hearing would be held on December 8, 1999, to determine whether FSCU should be required to establish special reserves regarding its loan activity and to determine whether Brackin should be prohibited from further participation in the affairs of the credit union. At the request of Brackin and/or her attorney, the ACUA subsequently rescheduled the hearing for December 14.
On December 14, the hearing was held; ACUA administrator Latham presided.[17] Present at the hearing were Steve Trimmier, Raha Khalaf, an associate with the Trimmier Law Firm, Rutledge, Fields, Livingston, and Hense Ellis II, an assistant attorney general. Brackin and her counsel refused to attend the hearing, asserting that they had been provided inadequate notice of the allegations against Brackin and the documents to be used in support of those allegations.
As a result of this hearing, Latham directed FSCU to prohibit Brackin from participating in any of FSCU's affairs; Latham also directed FSCU to proceed with the filing of its claim with its fidelity insurer.[18] Brackin's employment was officially terminated on December 24, 1999. Brackin did not appeal Latham's order as allowed under § 5-17-8(k), Ala.Code 1975.[19]
On May 22, 2000, Brackin sued FSCU, Fields (both in his individual capacity and in his capacity as the president of FSCU), the ACUL, and Rutledge (both in her individual capacity and as an agent of the ACUL). Brackin alleged defamation as a result of the statements made to Rutledge by the FSCU employees (count I); defamation as a result of the statements made by the ACUL, by and through its agent Rutledge, during the December 14, 1999, hearing before the ACUA (count II); a civil conspiracy between FSCU, the ACUL, and Rutledge to blame Brackin for deficiencies and inaccuracies in numerous loan transactions entered into by FSCU (count III); and negligence, willfulness, and wantonness on the part of the ACUL in failing to monitor the actions of its agent Rutledge and negligence, willfulness, and wantonness on the part of FSCU in failing to monitor the actions of its agent Fields (count IV). Brackin later added the *216 Trimmier Law Firm as a defendant, alleging that the law firm had violated the Legal Services Liability Act, § 6-5-570 et seq., Ala.Code 1975, by failing to properly and adequately conduct the investigation at FSCU (count V).
In March 2002, after engaging in discovery, all of the defendants filed motions for a summary judgment.[20] On April 9, 2002, the trial judge entered an order dismissing all claims asserted against Fields pursuant to a joint stipulation of dismissal filed by Brackin and Fields.
On August 12, 2002, the trial judge entered its order on the remaining summary-judgment motions. In that order, the trial court
1. denied FSCU's motion for a summary judgment on the defamation claim asserted in count I as to statements made by FSCU employees other than Ron Fields;
2. denied the ACUL's and Rutledge's motions for a summary judgment on the defamation claim asserted in count II of the complaint;
3. entered summary judgments in favor of FSCU, the ACUL, and Fields as to count III of the complaint, alleging a civil conspiracy;[21]
4. entered summary judgments in favor of FSCU, the ACUL, and Fields as to count IV of the complaint, alleging wantonness and/or willfulness;
5. entered a summary judgment in favor of the ACUL as to count IV of the complaint, alleging negligence;[22]
6. entered a summary judgment in favor of FSCU and Fields as to count IV of the complaint, alleging negligence, except as to those claims in count IV alleging that FSCU and Fields failed to monitor FSCU's employees and to apply its rules, policies, regulations, or procedures to prevent its employees from using each other's approval codes in loan and credit-collection transactions; and
7. entered a summary judgment in favor of the Trimmier Law Firm as to count V of the complaint, alleging a violation of the Alabama Legal Services Liability Act.
Thus, the only claims that survived the defendants' summary-judgment motions were Brackin's defamation claims against FSCU (based on certain statements made by Brackin's co-employees to Rutledge during the September 8, 9, and 10, 1999, investigation of Smith);[23] Brackin's claim that the ACUL, acting by and through its agent, Rutledge, defamed her as a result of certain statements made at the December 14, 1999, hearing;[24] and Brackin's *217 claim that FSCU and Fields negligently failed to monitor FSCU's employees and negligently failed to apply its rules, policies, regulations, or procedures to prevent its employees from using each other's approval codes in loan transactions and credit-collection transactions.[25]
Those remaining claims went to trial. At the close of Brackin's case-in-chief, the trial court entered judgments as a matter of law for the ACUL and Rutledge on the defamation claims asserted against them. The trial court also entered a judgment as a matter of law for FSCU and Fields on Brackin's negligence claim. The trial court also entered a judgment as a matter of law for FSCU on Brackin's defamation claim as to the statements made by all of the FSCU employees except those made by John Salter and Charles Cushing and portions of Rolanda Johnson's statement and Bobby Chitwood's statement.
After a lengthy trial, the trial court submitted to the jury Brackin's defamation claim against FSCU based on the statements of the remaining employees. The jury returned a verdict in favor of Brackin, awarding her $800,000 in compensatory damages[26] and $200,000 in punitive damages. On February 10, 2003, the trial court entered its judgment on the verdict. On March 10, 2003, FSCU filed a motion for a judgment as a matter of law, a motion for a new trial, or, alternatively, a motion for a remittitur. The trial court denied those motions on May 13, 2003.
Brackin appeals the judgments entered on her claims against the Trimmier Law Firm, the ACUL, and Rutledge (case no. 1021005). In her appeal, she asserts the following issues:
"1. Whether the Court erred in granting the defendants Jo Lynn Rutledge and ACUL's motion for judgment as a matter of law at the close of the plaintiff's case in chief.
"2. Whether the plaintiff presented substantial evidence to demonstrate that Jo Lynn Rutledge published defamatory statements regarding the plaintiff with common law malice.
"3. Whether the plaintiff presented substantial evidence to demonstrate that defendant Jo Lynn Rutledge was negligent in the performance of her investigation, wherein she concluded that the plaintiff had engaged in serious credit union policy violations in connection with certain loan transactions.
"4. Whether the trial court erred by granting summary judgment in favor of defendant Trimmier Law Firm based upon its ruling that the plaintiff had not alleged a claim for defamation or negligence.
"5. Whether the trial court erred in denying the plaintiff's motion to amend the complaint as to defendant Trimmier Law Firm to more particularly plead her claims of defamation and negligence, which was filed more than eight (8) months prior to the trial, and because this amendment did not change the nature of the case, nor the operative facts.

*218 "6. Whether the court erred in denying the plaintiff's motion to continue the summary judgment hearing based upon the fact that discovery was incomplete and ongoing, as to defendant Trimmier at the time of the hearing on the defendant's motion."
FSCU appeals from the judgment entered on the jury verdict (case no. 1021593). On appeal, FSCU asserts, among others, the following issues:
"1. Whether the trial court erred in denying FSCU's motion for judgment as a matter of law and submitting the case to the jury based on the fact that Brackin failed to establish the elements of a defamation claim.
"2. Whether there was a publication to support a claim of defamation where, during the course of an audit at a financial agency, employees of the institution made allegedly defamatory statements regarding another employee to an auditor who had been specially retained to perform the audit."

Case no. 1021593 (FSCU's appeal)
We first address the issues raised by FSCU. FSCU asserts that the trial court erred in denying its motion for a judgment as a matter of law as to Brackin's defamation claim relating to the statements by Salter, Cushing, Johnson, and Chitwood because, it says, Brackin failed to establish all of the necessary elements of a defamation claim. To have established an actionable defamation claim, Brackin must have shown that FSCU, through those employees, published to a third person a false and defamatory statement about her. K-Mart Corp. v. Pendergrass, 494 So.2d 600 (Ala.1986); Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085 (Ala.1988). Brackin's defamation claim against FSCU was premised on the following statements made by four FSCU employees to Rutledge during the Mitchell Smith investigation:
John Salter's Statement dated 9/21/99
"I have been instructed on several different occasions to alter due dates on delinquent loans at [FSCU]. It usually took place in Karen Brackin's office at or near the end of the month. There were always two employees present  myself and Ann McMillan. We would review accounts and Karen would say something to effect of, `Don't let this account hit us' or `Let's move this one.' After that, Ann or myself would change the due date to reflect the outcome of the conversation.
"In another incident, I was in Karen Brackin's office when she instructed Rolanda Johnson to get a file from the mortgage department and bring it back to her office. Rolanda was then instructed to take the disbursement check to the real estate attorney's office. Rolanda was told to leave the check with the attorney and return the paperwork to Karen. Rolanda returned the paperwork to Karen and was instructed to say she did not know where the paperwork was if anyone questioned her about it."
Rolanda Johnson's Statement (undated)
"Re: [G.T. and D.T.] loan

"Karen Brackin had me call [the real estate attorneys] and tell them that the above closing was to be handled as a cash sale. Approximately a week later, she told me to go down to the mortgage department and pick up the paperwork and the check for the above loan and bring them back to her. I did as told and when I returned to her office, I was told to take the paperwork and the check out of the building with me, but to give the check to the lawyer's office but leave the paperwork in my car while at the lawyer's office. I was also instructed *219 that when I returned to give the paperwork back to Karen Brackin. I done as instructed and was told when I returned that if anyone asked where the paperwork was to tell them that I did not know where the paperwork was.
"I was approached sometime during the week of Sept. 7-10 by Brenda Rhoden wanting to know where the paperwork was on [G. and D.T.]. I disobeyed my superior[;] however I told her that I gave Karen Brackin the paperwork back after I returned from the lawyer's office. Karen Brackin called the same day and I asked her where the paperwork was. She stated that the paperwork was in the trunk of her car."
Charles Cushing's Statement (undated)
"User # 113
"User # 703 (when I worked at Cullman branch)
"1. Instructed to move due dates [on loan transactions involving J.B., P.R., A.Y.], OTHERS NAMES I WOULD HAVE TO RESEARCH.
"2. Refinanced loans for [H.B.] that value of vehicle was not sufficient for loan."

Bobby Chitwood's Statement dated 7/20/99[27]
"Acct # [_______]
"Mr. [J.T.] and his father came into my office 7/20/99 at approximately 5:00 p.m. Mr. [T.], [J.'s] father, did most of the talking. [J.'s] father had called Karen Brackin the night before and spoke to her about a loan for [J.] When the member came into my office the member's father told me he was supposed to see Connie Drane. Mrs. Drane had left for the day so I took the member. After hearing this from the member I asked my direct supervisor if she knew anything about the loan. Mrs. Ricks said she knew they were coming but that Mrs. Drane was going to handle it but since she was gone, for me to help them. The member's father, Mr. [T.], told me Connie was supposed to have all the papers `ready to sign' so the member could just sign and leave. I told the member that this was not possible because they had only opened their account just prior to coming into my office. I informed the member that an account had to be opened to process a loan and we would have to start at the beginning. [J.'s] father then became upset at this and said he was in a hurry and did not have a lot of time.
"When I looked at [J.'s] age I immediately saw that his birthday was 8/05/99. [J.] was not yet 19 yrs of age. I asked [J.] if he were married and his reply was that he was going to be married but not yet. As my understanding of state law through training sessions, a member must be of age 19 or may be of age 18 if they are married. [J.] at this time does fit either of these qualifications. I asked my [member] to hold on for a minute and I would get with Mrs. Ricks. [J.'s] father [said] he could not understand what the problem was, and Mrs. Brackin had o.k.'d the loan. The father then got up and said they had somewhere they had to be and that they would call Karen Brackin in the morning. I asked the [member] if they would be willing to come back and talk to me in the morning, *220 but they said they would let her handle it. At that point I told the member that Mrs. Brackin did not necessarily do loans and that she would probably send them back to the loan department. I also asked the father could we do the loan in his name, but he did not want this either. As it was the only way to process the loan was in [J.'s] name who had opened an [account] in his name, not the father [sic]. [J.] could not be given a loan at this time from my understanding of FSCU loan policy or from state law as I understand it.
"The member and father left visibly angry, but I felt as if I had not received all the information and was not given a proper chance to get the information. I also was not given the chance to build a loan for the [member] or even for his father had he opened an [account]."
FSCU argues, among other things, that Brackin failed to establish that FSCU published those statements to a third party. We agree.
In Burney v. Southern Ry., 276 Ala. 637, 165 So.2d 726 (1964), the Alabama Supreme Court held that a manager's dictation to his secretary of a letter containing allegedly defamatory statements regarding an employee was insufficient to support the employee's libel claim against his employer. The Burney Court held that no publication had occurred because the statements were communicated only to a fellow employee in the course of transacting the corporation's business. In reaching this conclusion, the Burney Court quoted extensively from Prins v. Holland-North America Mortgage Co., 107 Wash. 206, 181 P. 680 (1919):
"`Publication of a libel is the communication of the defamatory matter to some third person or persons. Here, the communication was sent from the main office of the company to its branch office. Until the appellant himself spread the letter broadcast to the world, it does not appear from the complaint that it was exhibited to anyone other than the officers and employes [sic] of the respondent company, whose very duties, in the conduct of the ordinary business of the company, brought them in contact with it. Agents and employes [sic] of this character are not third persons in their relations to the corporation, within the meaning of the laws pertaining to the publication of libels. For the time being, they are a part and parcel of the corporation itself, so much so, indeed, that their acts within the limits of their employment are the acts of the corporation. For a corporation, therefore, acting through one of its agents or representatives, to send a libelous communication to another of its agents or representatives, cannot be a publication of the libel on the part of the corporation. It is but communicating with itself. The corporation can act only through officers and agents, and the officers and agents authorized to act for it are as much a part of the corporation at one place as at another, and the receipt or perusal of the letter by the corporation officers and agents at Seattle was as much the act of the corporation as was the writing of the letter by an officer or agent at the place of origin of the letter. It is not the publication of a libel for a person to write and mail a libelous letter to the person libeled, if he gives it no further publication, and for a much stronger reason it is not a publication of a libel for one person to write a libelous letter to himself, which he exhibits to no other person. It must follow that a corporation, although it can act only through officers and agents, is not guilty of publishing a libel, when it writes a libelous letter at one of its branch offices and mails it to another.'"
*221 Burney, 276 Ala. at 640-41, 165 So.2d at 729-30, quoting Prins, 107 Wash. at 208-09, 181 P. at 680-81 (emphasis added). Thus, the rationale of Prins involved the concept of agency and was actually broader than necessary to resolve the issue presented in Burney; the Prins Court found that the communication at issue was not "published" for purposes of a defamation claim, because it was communicated only to employees and agents of the employer.
The concept of representation by agency was again addressed in the case of McDaniel v. Crescent Motors, Inc., 249 Ala. 330, 31 So.2d 343 (1947). In McDaniel, an employee sued his employer alleging defamation based on a conversation that occurred between three of the employer's managers and a union representative who was acting as an agent for the plaintiff. Because the union representative was acting on behalf of the plaintiff and the managers were acting on behalf of the corporation, the Alabama Supreme Court held that the communication had not been published to a third party. Because no third party was involved, for purposes of a defamation claim there had been no publication. The McDaniel Court stated "[w]e do not reach the matter of privilege, malice or any other question until there is a publication." 249 Ala. at 333, 31 So.2d at 345.
The concept of agency was again discussed in Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085 (Ala.1988). The Nelson Court stated:
"Because [the speaking employee's] communications were necessary in determining the culpability of [the terminated employee] and other employees, they concerned corporate business and fell within the McDaniel/Burney `no publication' rule.... As long as a communication to a non-managerial employee falls within the proper scope of that employee's knowledge or duties, the McDaniel/Burney rule applies to non-managerial employees as well as to managerial employees. A corporation can act only through its servants, agents, or employees, ... and when officers and employees of a corporation act within the scope of their employment and within the line of their duties, they are not third persons vis-á-vis the corporation."
534 So.2d at 1093.[28]
Although the facts of this case are somewhat different than those discussed above, they are similar enough for us to conclude that the statements made by FSCU employees to Rutledge, FSCU's agent, during her investigation fall within the parameters of the "no-publication" rule. First, these statements, which concern FSCU's loan activities, were given by Salter, Johnson, Cushing, and Chitwood, who were at that time employed by FSCU, in response to questions posed by Rutledge, an auditor specially retained by FSCU's attorney to assist FSCU in complying with the DOR issued by the ACUA. Rutledge's questions that elicited the information concerned FSCU loan transactions and the employees' activities while performing their duties at FSCU. Thus, the four employees were clearly acting within the line and scope of their employment *222 when they responded to Rutledge's questions.
We also find that Rutledge's questions to the employees fell within the line and scope of her agency for FSCU. That Rutledge was acting as an agent for FSCU is clear. FSCU hired the Trimmier Law Firm to oversee the investigation ordered by the ACUA; the Trimmier Law Firm hired Rutledge to actually perform that investigation. Rutledge explained her arrangement as follows: "I reported to Mr. Steve Trimmier. I also reported to the [FSCU] supervisory committee. And I also reported to the agency that the supervisory committee was charged with reporting to." She also explained that she was acting as an agent of FSCU, that FSCU was responsible for paying the Trimmier Law Firm, and that the Trimmier Law Firm was responsible for paying her.
We also conclude that Rutledge did not exceed the scope of her agency in asking the employees about Brackin's activities in regard to loan transactions. FSCU was required by the ACUA, the state agency charged with overseeing and regulating state-chartered credit unions, to hire an outside firm to conduct an investigation into, among other things, "credit union official and employee loan, deposit, and withdrawal activities (this includes relative accounts)" and "any suspicious activities discovered by any of the credit union's employees, past and present," and to perform an internal control review of the credit union's operations. Therefore, FSCU was required to hire a nonemployee agent to conduct the investigation.
FSCU hired the Trimmier Law Firm, which, in turn, retained Rutledge to conduct the investigation. Thus, Rutledge was retained by FSCU and by the Trimmier Law Firm to assist in complying with the directives of the ACUA. By compiling information on the loan transactions and the improper activities allegedly occurring at FSCU, Rutledge was unquestionably performing a legitimate business task for FSCU and the task for which she had been retained. The scope of Rutledge's investigation included all suspicious activities by any of the credit union's employees, past and present. When Rutledge discovered questionable loan activity that appeared to involve Brackin or Brackin's relatives, Brackin's activities were unequivocally within the scope of Rutledge's investigation.
Additionally, the statements given to Rutledge by Salter, Johnson, Cushing, and Chitwood were statements given by employees of FSCU to an agent of FSCU in the course of transacting legitimate FSCU business; those communications were within the scope of both the employees' and the agent's duties. Also, the extent of the communications did not exceed what was reasonably necessary; the employees communicated their statements only to an agent of FSCU while she was legitimately engaged in FSCU business and only to the extent necessary to conduct that business.
For all of these reasons, the employees' communications to Rutledge did not amount to "publications" to a third party for purposes of establishing a defamation claim. As recognized in McDaniel, supra, if there is no publication to a third party, there can be no defamation and there is no need to consider malice, privilege, or any of the other elements of defamation. Because the statements made by FSCU's employees to Rutledge were published not to a third party but only to Rutledge, an agent of FSCU, and only within the scope of the employees' duties and the scope of Rutledge's agency, those statements cannot, as a matter of law, properly serve as the basis for Brackin's defamation claim against FSCU.
*223 Because we have concluded that the employees' statements to Rutledge did not rise to the level of a publication for purposes of a defamation claim, we must conclude that the trial court erred in denying FSCU's motion for a judgment as a matter of law and that the trial court improperly submitted Brackin's defamation claim against FSCU to the jury. We reverse the judgment, and we remand this cause to the trial court for the entry of a judgment as a matter of law in favor of FSCU. Because of our resolution of this issue, we pretermit consideration of the other issues raised by FSCU on appeal.

Case no. 1021005 (Brackin's appeal)

Brackin's Defamation Claim Against Rutledge and the ACUL
At the close of Brackin's case-in-chief, the trial court granted the ACUL and Rutledge a judgment as a matter of law on Brackin's defamation claim against them; the trial court held that any communications made by Rutledge were subject to a conditional privilege and that Brackin had not produced substantial evidence of actual malice necessary to overcome that privilege. Brackin appeals from this judgment, arguing that the trial court erred in not submitting her defamation claim against Rutledge and the ACUL to the jury. Brackin argues that she presented substantial evidence indicating that, during Rutledge's September 10, 1999, telephone conversation with Lloyd Moore, and again at the December 14, 1999, hearing before the ACUA, Rutledge published false and defamatory statements regarding Brackin. Brackin also asserts that she produced substantial evidence tending to establish that Rutledge acted with common-law malice.
We agree with the trial court on this issue; no publication occurred. As already discussed, Rutledge was acting as FSCU's agent at the time of her communications with Moore and the ACUA.[29] Brackin's counsel admitted as much at trial. However, Brackin's counsel contended that when Rutledge contacted Moore and relayed the information she had learned during her investigation, she exceeded the scope of her agency and that, therefore, Rutledge's communication with Moore was a publication to a third party.
We disagree. The DOR specifically directed FSCU to engage an outside firm to confirm the entries in the supplemental facts section of the report showing apparent improprieties and "any other related activities discovered during the review"; to investigate, among other things, "credit union official and employee loan, deposit, and withdrawal activities (this includes relative accounts)" and "any suspicious activities discovered by any of the credit union's employees, past and present"; and to perform an internal control review of the credit union's operations.
FSCU retained the Trimmier Law Firm to oversee this investigation. The Trimmier Law Firm, in turn, retained Rutledge to perform the hands-on investigation at FSCU. In the course of performing this investigation, Rutledge discovered several loans for which Smith was responsible and on which the due dates had been advanced with no explanation; Rutledge's investigation of those loans led her to the employees' allegations of wrongdoing against Brackin. Rutledge's questions regarding Brackin's activities fell within the scope of her agency with the Trimmier Law Firm and with FSCU.
*224 We also find that Rutledge's communication to Moore, the senior examiner with the ACUA, was protected by a conditional privilege. Alabama law has long recognized that certain communications, even some that tend to defame or disparage a person, are protected by a qualified privilege:
"`Where a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged.... The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is ... moral in its nature....'"
Berry v. City of New York Ins. Co., 210 Ala. 369, 371, 98 So. 290, 292 (1923). "The only variety of defamation not subject to the defense of qualified privilege is defamation committed with actual malice (as distinguished from implied malice). A plaintiff cannot prevail against an established defense of qualified [or conditional] privilege unless he has pleaded and proved defamation committed with actual malice." Ex parte Blue Cross & Blue Shield of Alabama, 773 So.2d 475, 479 (Ala.2000) (citation omitted).
The ACUA directed FSCU to perform the investigation as outlined in the DOR; that DOR instructed FSCU to communicate the results of the investigation to the ACUA. Additionally, the ACUA presided over the December 1999 hearing. It cannot be disputed that the ACUA had an interest in receiving the information Rutledge learned during her September 1999 investigation, which we have already concluded was within the scope of her agency, and that the ACUA had an interest in the testimony provided by Rutledge at the December 1999 hearing. Therefore, Rutledge's communications to Moore in September 1999 and Rutledge's testimony at the ACUA hearing in December 1999 were protected by a conditional privilege.
In order to overcome that conditional privilege, Brackin was required to establish by substantial evidence that Rutledge made those defamatory communications with common-law or actual malice. We acknowledge that the question whether a communication was made with actual malice in a defamation case is generally within the province of the jury. However, there must be substantial evidence of actual malice to justify submitting the question to the jury. Actual malice may be shown "by evidence of previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like, emanating from the defendant, or by the violence of the defendant's language, the mode and extent of publication, and the like." Kenney v. Gurley, 208 Ala. 623, 626, 95 So. 34, 37 (1923).
In this case, Brackin did not present substantial evidence showing that Rutledge acted with actual malice in publishing these communications. Brackin did not claim or establish that Rutledge had previously libeled or slandered her. There was no evidence indicating that Rutledge fabricated the employees' statements tending to implicate Brackin. Rutledge did not fabricate the existence of unsigned loan documents or the missing loan files. She did not fabricate the information regarding improper loans made to Brackin's family members.
However, Brackin argues that Rutledge made no effort to verify any of the information provided to her by the other FSCU employees, that Rutledge did not attempt to interview or contact any of FSCU's borrowers to determine the accuracy of *225 the employees' statements, and that Rutledge did not attempt to question Brackin. Brackin asserts that this failure to investigate the accuracy of the employees' statements is evidence of actual malice, which, she argues, includes defamatory statements "`made with reckless disregard of whether they are false.'" Barnett v. Mobile County Personnel Bd., 536 So.2d 46, 54 (Ala.1988) (quoting Prudential Ins. Co. of America v. Watts, 451 So.2d 310, 313 (Ala.Civ.App.1984)).
The testimony at trial revealed that, at the time of Rutledge's alleged defamatory communications, Rutledge had already viewed the file-maintenance report, which revealed loans the due dates of which had been advanced, but that some of the relevant loan files were missing. Additionally, in reporting statements such as those of the employees, Rutledge could not have determined the validity of the employees' statements concerning Brackin because of the nature of those statements.[30] Rutledge was not a trier of fact over allegations of wrongdoing at FSCU; she was merely investigating loan transactions. Her role as an investigator required her to report her findings from that investigation to the appropriate entities and/or persons. She did so. Based on this testimony, we find no evidence to indicate that Rutledge knew that any of the statements made in her report were false or that she acted with reckless disregard of their falsity.
The only allegations raised at trial that could possibly amount to evidence tending to show that Rutledge acted with malice was Brackin's allegation that Rutledge was embarrassed because, in her previous audits, she had failed to detect Smith's wrongdoing and that Rutledge was determined to "catch" someone.[31] Brackin described this as a "rivalry" between Rutledge and Brackin. However, this allegation, standing alone, does not rise to the level of substantial evidence of actual malice on Rutledge's part, under the facts of this case.
According to the record, Rutledge properly performed her obligations as an agent of the Trimmier Law Firm and as an agent of FSCU. Rutledge published the allegedly defamatory statements only to those persons who had a legitimate business interest in the communications and then only to the extent necessary. We agree with the trial court that Brackin did not produce substantial evidence of actual malice; therefore, we agree that Brackin failed to overcome the conditional privilege protecting Rutledge's statements. The trial court properly granted the ACUL and Rutledge a judgment as a matter of law on Brackin's defamation claim.

Brackin's Negligence Claim Against Rutledge and the ACUL
At the close of Brackin's case-in-chief, the trial court also entered a judgment as *226 a matter of law as to Brackin's claim of negligence against the ACUL and Rutledge.[32] Brackin argues that the trial court erred because, she says, she offered substantial evidence in support of her negligence claim. Brackin alleges that, although Rutledge initially owed her no duty because Rutledge had been retained by FSCU to investigate the loan improprieties, Rutledge then undertook an investigation of Brackin. Therefore, Brackin asserts, Rutledge was obligated to perform that investigation properly and adequately. We reject this argument for two reasons.
In order to have survived the motion for a judgment as a matter of law, Brackin must have produced substantial evidence indicating that Rutledge owed her a duty, that Rutledge breached that duty, and that Brackin was damaged as a proximate cause of that breach. Armstrong Bus. Servs., Inc. v. AmSouth Bank, 817 So.2d 665, 679 (Ala.2001). Because Rutledge was acting as an agent of the Trimmier Law Firm and of FSCU when she conducted her investigation, she owed a duty to her principals  the Trimmier Law Firm and FSCU  to properly perform her investigation. She did so. Brackin has not cited any authority for the proposition that Rutledge owed Brackin a duty to avoid uncovering damaging information about her while performing that investigation.
Second, we find no evidence in the record tending to establish that Rutledge's investigation improperly caused Brackin harm. Thus, we find no evidence of a breach of any duty owed to Brackin.
Because there was no evidence that Rutledge owed any duty to Brackin, Brackin failed to present a viable negligence claim against Rutledge or the ACUL. We affirm the judgment as a matter of law in favor of the ACUL and Rutledge on Brackin's negligence claim.

Brackin's Claims Against the Trimmier Law Firm
Brackin contends that the trial court erred by striking, on its own motion, her second amended complaint. On September 14, 2001, Brackin amended her complaint to name the Trimmier Law Firm as a party and to assert a single cause of action against the Trimmier Law Firm  a claim brought pursuant to § 6-5-570 et seq., Ala.Code 1975, the Legal Services Liability Act.
In October 2001, the Trimmier Law Firm filed its answer to the amended complaint. On February 22, 2002, the trial court conducted a pretrial conference; Brackin's counsel was instructed to finalize a pretrial order and to submit it within 15 days. The pretrial order was finalized and filed with the trial court on March 14, 2002. In this order, the trial court scheduled this matter for trial on May 6; in the order, the trial court instructed the parties that "no further pleadings, amendments or motions will be filed without leave of the Court."
On March 1, 2002, the Trimmier Law Firm filed a motion for leave to amend its answer, asserting the affirmative defenses of qualified and absolute privilege and qualified and absolute immunity. Over the next several days, Fields, Rutledge, the ACUL, and FSCU sought leave to file amended answers to the complaint, attempting to assert the affirmative defense *227 of absolute privilege. All the defendants then filed motions for a summary judgment and supporting briefs.
On March 12, Brackin opposed the defendants' motions to amend their answers to the complaint, arguing that the defendants had not asserted the affirmative defenses they were seeking to assert within the time allowed by the Alabama Rules of Civil Procedures or within the time allowed by the pretrial order.[33]
On the same date that Brackin's counsel filed the completed pretrial order, Brackin also filed her second amended complaint.[34] She did not obtain leave of the trial court for that amendment. In her second amended complaint, Brackin alleged negligence and defamation against the Trimmier Law Firm. Brackin asserted that, although not specifically pleaded in her first amended complaint, those claims were implicitly pleaded in that complaint because she had included language in the first amended complaint that adopted and realleged each and every allegation stated in the original complaint. However, in her second amended complaint, Brackin asserted that she was now explicitly stating those causes of action in order to "avoid any confusion" regarding the claims she was asserting against the Trimmier Law Firm.
Later that same day, the trial court issued an order, denying "[t]he defendants' respective motions for leave to amend their answers." The trial court noted in its order that "said motions were filed after Judge Brown pre-tried this case, and the Defendants did not obtain additional time to file amended answers. The Court is of the opinion that to allow such amendments would be unduly prejudicial to the Plaintiff." Additionally, in that order, and on its own motion, the trial court disallowed Brackin's second amended complaint.[35] The trial court again noted that "during the pretrial conference the Plaintiff made no request to reserve time for further amending her complaint."
Brackin asserts that the trial court erred in ruling that she had not alleged a claim of defamation or negligence against the Trimmier Law Firm in her first amended complaint. Brackin also alleges that the trial court erred in striking her second amended complaint to more particularly plead her claims of defamation and negligence against the Trimmier Law Firm. We affirm the judgment of the trial court on these issues.
First, we need do nothing more than read the amended complaint to conclude that Brackin did not allege defamation and negligence against the Trimmier Law Firm in her first amended complaint. That complaint contains one count  count five  that specifically identifies the claim asserted therein as being brought pursuant to the Legal Services Liability Act. Brackin, as the plaintiff in this action, is in charge of and is responsible for the claims she asserts. In her first amended complaint, she specifically elected to assert a cause of action against the Trimmier Law Firm brought pursuant to the Legal Services Liability Act. She also elected not to *228 assert any other causes of action at that time. We find no error in the trial court's construction of Brackin's first amended complaint.
Second, Rule 15(a), Ala. R. Civ. P., which provides when a pleading may be amended, states, in relevant part:
"(a) Amendments. Unless a court has ordered otherwise, a party may amend a pleading without leave of court, but subject to disallowance on the court's own motion or a motion to strike of an adverse party, at any time more than forty-two (42) days before the first setting of the case for trial, and such an amendment shall be freely allowed when justice so requires. Thereafter, a party may amend a pleading only by leave of court, and leave shall be given only upon a showing of good cause."
Under Alabama law, whether to allow an amendment to a pleading is a matter within the discretion of the trial court. Rampey v. Novartis Consumer Health, Inc., 867 So.2d 1079 (Ala.2003). Thus, we review the trial court's disallowance of Brackin's second amended complaint only to determine if the trial court exceeded its discretion in disallowing it.
In Government Street Lumber Co. v. AmSouth Bank, N.A., 553 So.2d 68 (Ala.1989), the plaintiffs sought to amend their complaint after the defendant filed its motion for a summary judgment. The trial court disallowed the amended complaint. On appeal, the Alabama Supreme Court affirmed the trial court's ruling, stating:
"`Under Rule 15, the trial judges must be given discretion to allow or refuse amendments. This Court has held that amendments are to be freely allowed and that their refusal must be based on a valid ground. Liberality of amendment does not include a situation where the trial on the issues will be unduly delayed or the opposing party unduly prejudiced.'"
Government Street Lumber Co., 553 So.2d at 70 (quoting Alabama Farm Bureau Mut. Cas. Ins. Co. v. Guthrie, 338 So.2d 1276, 1279 (Ala.1976)).
In this case, Brackin sought to amend her complaint for the second time (1) some two years after she originally filed her lawsuit; (2) after the trial court's deadline for the filing of pleadings had passed and after Brackin had successfully blocked the defendants from amending their answers on that basis; (3) six weeks before the case was to be tried;[36] and (4) after the defendants had already submitted their motions seeking a summary judgment and briefs in support of those motions. We cannot find that in disallowing this second amended complaint the trial court exceeded its discretion.
Brackin next argues that the trial court erred in denying her motion to continue the hearing on the summary-judgment motions because discovery as to the Trimmier Law Firm was incomplete and ongoing. We find that in so ruling the trial court did not err or exceed its discretion.
In Reeves v. Porter, 521 So.2d 963, 965 (Ala.1988), this Court wrote:
"The mere pendency of discovery does not bar summary judgment. If the trial court from the evidence before it, or the appellate court from the record, can ascertain that the matter subject to production was crucial to the non-moving party's case or that the answers to the *229 interrogatories were crucial to the non-moving party's case, then it is error for the trial court to grant summary judgment before the items have been produced or the answers given. However, the burden of showing that these items are crucial is upon the non-moving party. He can do so by complying with Rule 56(f), Ala. R. Civ. P.... However, when no such crucial evidence would be supplied by the production or by the answers to the interrogatories, it is not error for the trial court to grant summary judgment with discovery pending."
(Citations omitted.)
The only claim allowed by the trial court against the Trimmier Law Firm was the alleged violation of the Legal Services Liability Act. An attorney-client relationship is an essential element of a claim under the Legal Services Liability Act, and in support of its motion for a summary judgment, the Trimmier Law Firm submitted undisputed evidence that it had never entered into an attorney-client relationship with Brackin. See Sessions v. Espy, 854 So.2d 515 (Ala.2002) (recognizing that claims against a lawyer that are alleged to have arisen out of the attorney-client relationship are all subsumed under the Alabama Legal Services Liability Act); Peterson v. Anderson, 719 So.2d 216 (Ala.Civ.App.1997) (because the plaintiffs were not clients of the testator's attorney, the plaintiffs lacked standing to pursue an action against the attorney under the Alabama Legal Services Liability Act).
Therefore, the trial court had before it ample evidence to properly dispose of Brackin's claim on the Trimmier Law Firm's motion for a summary judgment; no amount of discovery would have supported a different result. The trial court did not err in refusing to continue the hearing on the summary-judgment motions in order to allow Brackin to complete discovery related to her pending claim against the Trimmier Law Firm.

Conclusion
In case no. 1021593, we reverse the judgment entered on the jury's verdict and we remand this cause to the trial court for the entry of a judgment as a matter of law in favor of FSCU. In case no. 1021005, we affirm the judgment in favor of the ACUL and Rutledge on Brackin's defamation and negligence claims and the judgment in favor of the Trimmier Law Firm on Brackin's claim brought pursuant to the Legal Services Liability Act. We find no basis for reversal in the other issues raised by Brackin on appeal.
1021005  AFFIRMED.
BROWN, HARWOOD, and WOODALL, JJ., concur.
JOHNSTONE, J., concurs in the rationale in part and concurs in the judgment.
1021593  REVERSED AND REMANDED WITH DIRECTIONS.
BROWN, JOHNSTONE, HARWOOD, and WOODALL, JJ., concur.
JOHNSTONE, Justice (concurring in the rationale in part and concurring in the judgments).
But for two exceptions, I concur in the rationale of the main opinion. I concur in all of the judgments in the main opinion.
My first exception is that I express no opinion about footnote 28 in the main opinion. 897 So.2d at 221. My second exception is that I do not agree with the holding in the main opinion that the statements of the defendant Rutledge, an agent of FSCU, to the defendant Moore, an agent of the defendant ACUA, an entity entirely distinct from FSCU, did not constitute a publication. 897 So.2d at 223. Because *230 Moore was not Rutledge's fellow agent of FSCU, Rutledge's statements to Moore did constitute publications. I agree with the main opinion, however, that the defense of qualified privilege is established by the record as a matter of law and undisputed fact in favor of both Rutledge and ACUA and that the requisite malice by either defendant is not supported by substantial evidence.

On Applications for Rehearing
STUART, Justice.
APPLICATIONS OVERRULED; OPINION OF MAY 28, 2004, MODIFIED.
HOUSTON, LYONS, BROWN, JOHNSTONE, HARWOOD, and WOODALL, JJ., concur.
BROWN, J., files statement of nonrecusal in case no. 1021593.
BROWN, Justice (statement of nonrecusal in case no. 1021593).
Along with her application for rehearing in case no. 1021593, the plaintiff, Karen Brackin, through her attorneys, has filed a motion for my recusal.[1] After carefully considering the grounds raised in the recusal motion, I have determined that I am not disqualified from deciding the appeal filed by Family Security Credit Union ("FSCU") and that it is my constitutional duty to decide this case. I, therefore, decline to recuse myself.
The following facts form the basis of Brackin's recusal motion: After a jury trial, Brackin was awarded $800,000 in compensatory damages and $200,000 in punitive damages in a defamation action against her former employer, FSCU. FSCU appealed the judgment to this Court. Several entities, including the Alabama Banker's Association, were granted leave to file briefs as amici curiae in FSCU's appeal. On April 27, 2004, Justice Stuart, to whom the case had been assigned, circulated to the division of Justices sitting on this case the proposed opinion disposing of the issues involved in FSCU's appeal.[2] On May 7, 2004, I entered my vote concurring with Justice Stuart's proposed opinion, and on May 28, 2004, this Court released its decision, reversing the judgment in favor of Brackin and remanding the case for the entry of a judgment as a matter of law in favor of FSCU. I, along with Justices Johnstone, Harwood, and Woodall, fully concurred in the opinion authored by Justice Stuart insofar as it disposed of case no. 1021593.
In her recusal motion, Brackin states that on April 30, 2004, while I was running for reelection to a seat on this Court, the Alabama Banker's Association contributed $42,500 to my principal campaign committee. Brackin further asserts that "just seven (7) days before the issuance of the Court's [o]pinion, [the Alabama Banker's Association] contributed an additional $9,000." In fact, my review of the reports of contributions filed by my principal campaign committee reveals that I received three contributions totaling $56,500 from ALABAPAC, a political action committee *231 sponsored by the Alabama Banker's Association.
Brackin states in her motion:
"Given the Alabama Banker's Association's substantial contributions to Justice Brown, while an appeal in which it has asserted a strong interest was pending, a reasonable person would certainly question Justice Brown's impartiality and thereby mandate her recusal. As a result, the Court must recuse/disqualify Justice Brown in view of the admonitions of Cannons [sic] 1, 2, and 3 of the Alabama Cannon [sic] of Judicial Ethics."
Although Brackin broadly refers in her motion to Canons 1, 2, and 3, of the Alabama Canons of Judicial Ethics as being the relevant Canons requiring my recusal, she fails to specify exactly what provision or subsection of those Canons she believes is at issue. Canons 2 and 3 are lengthy, and many of the sections and subsections in those Canons appear to be totally irrelevant to the assertions in Brackin's motion. The only specific reference to a Canon Brackin makes in her motion is to Canon 3.C(1). Although it is not my duty to make Brackin's arguments for her, I will attempt to address her concerns in light of the law of this State and the requirements of the Alabama Canons of Judicial Ethics.
"`The law of recusal reflects two fundamental judicial policies: First, it is the duty of a judge to decide cases. Second, a judge should be a neutral, or impartial, decision-maker.' Dunlop Tire Corp. v. Allen, 725 So.2d 960, 976 (Ala.1998) (See, J., statement of nonrecusal). The policies underpinning a judge's duty to vote on cases before him and a judge's duty to uphold the actual and apparent impartiality of the judiciary are embodied in Alabama's Canons of Judicial Ethics. Canon 3, Ala. Can. Jud. Eth. With respect to recusal, Canon 3C provides in pertinent part:
"`(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned....'"
Archer Daniels Midland Co. v. Seven Up Bottling Co., 746 So.2d 966, 991-93 (Ala.1999)(See, J., statement of nonrecusal)(footnotes omitted).
"We presume that a judge is qualified and unbiased; one who alleges otherwise and seeks a judge's recusal has the burden of proving the grounds for the recusal. McMurphy v. State, 455 So.2d 924, 929 (Ala.Crim.App.1984)." Gary v. Crouch, 867 So.2d 310, 320 (Ala.2003).
"`"Under Canon 3(C)(1), Alabama Canons of Judicial Ethics, recusal is required when `facts are shown which make it reasonable for members of the public or a party, or counsel opposed to question the impartiality of the judge.' Specifically, the Canon 3(C) test is: `Would a person of ordinary prudence in the judge's position knowing all the facts known to the judge find that there is a reasonable basis for questioning the judge's impartiality?' The question is not whether the judge was impartial in fact, but whether another person, knowing all the circumstances, might reasonably question the judge's impartiality  whether there is an appearance of impropriety."'
"[Ex parte] City of Dothan Personnel Bd., 831 So.2d [1,] 5-6 [(Ala.2002)] (quoting Ex parte Duncan, 638 So.2d 1332, 1334 (Ala.1994) (citations omitted))."
Ex parte Monsanto Co., 862 So.2d 595, 604-05 (Ala.2003)(footnote omitted). "`However, recusal is not required by the mere accusation of bias unsupported by *232 substantial evidence.'" Ex parte Potts, 814 So.2d 836, 839 (Ala.2001)(quoting Henderson v. G & G Corp., 582 So.2d 529, 530 (Ala.1991)). I do not believe that a person of ordinary prudence, knowing all of the circumstances of this case, would reasonably question my impartiality in rendering a decision in this appeal.
First, I note that contrary to Brackin's assertions the Alabama Banker's Association did not contribute to my campaign. Instead, my campaign committee received contributions from ALABAPAC, a political action committee sponsored by the Alabama Banker's Association, which receives and distributes contributions from its members, other individuals, and other political action committees. ALABAPAC is a separate legal entity from the Alabama Banker's Association.[3]
Furthermore, neither the Alabama Banker's Association nor ALABAPAC are parties to this appeal. Brackin, in her motion, refers to the Alabama Banker's Association as a "party" and as an "interested party" to this appeal in an attempt to manipulate her arguments into the proscriptions of the Canons of Judicial Ethics and Alabama caselaw. The Alabama Banker's Association, however, was given permission to file a brief in this appeal as an amicus curiae. An amicus curiae is not a party to an appeal, as explained by our well-settled caselaw:
"In Village of North Atlanta v. Cook, 219 Ga. 316, 133 S.E.2d 585 [(1963)], the Supreme Court of Georgia stated:
"`"The literal meaning of the term `amicus curiae' is a friend of the court, and the term includes persons, whether attorneys or laymen, who interpose in a judicial proceeding to assist the court by giving information, or otherwise, or who conduct an investigation or other proceeding on request or appointment therefor by the court." 4 Am.Jur.2d, Amicus Curiae, § 1, p. 109. A person appearing as amicus curiae is not a party or privy in an action. Douglas v. Trust Company of Ga., 147 Ga. 724, 95 S.E. 219 [(1918)].
"`....
"`... The function of an amicus curiae "is to call the court's attention to law or facts or circumstances in a matter then before it [that] may otherwise escape its consideration.... He has no control over the litigation and no right to institute any proceedings therein, he must accept the case before the court with the issues made by the parties." 4 Am.Jur.2d, Amicus Curiae, § 3, pp. 110, 111. ...'
"An amicus curiae is not a party, cannot assume the functions of a party, and cannot control the litigation. Kemp v. Rubin, 187 Misc. 707, 64 N.Y.S.2d 510 [(1946)]; In re Ohlhauser's Estate, 78 S.D. 319, 101 N.W.2d 827 [(1960)]."
State ex rel. Baxley v. Johnson, 293 Ala. 69, 74, 300 So.2d 106, 110-11 (1974). See also Courtaulds Fibers, Inc. v. Long, 779 So.2d 198, 202 n. 1 (Ala.2000); K.W. v. State Dep't of Human Res., 575 So.2d 579, 580 (Ala.Civ.App.1991).
In this case, a nonparty to this appeal  an amicus curiae  sponsored a political action committee, which, in turn, contributed to my campaign committee. I do not believe that the tenuous relationship between ALABAPAC, a third-party entity that contributed to my campaign, and Alabama Banker's Association, an amicus curiae, which merely advocated to this Court issues concerning the law as it relates to the *233 tort of defamation, would cause a person of ordinary prudence, knowing all of the circumstances, to question my impartiality in this case.[4]
Brackin further argues that my recusal is required under §§ 12-24-1 and -2, Ala.Code 1975. Section 12-24-1 expresses the intent of the Legislature in enacting statutes purporting to require the recusal of justices and judges who receive campaign contributions under certain circumstances. The Code section provides:
"The Legislature intends by this chapter to require the recusal of a justice or judge from hearing a case in which there may be an appearance of impropriety because as a candidate the justice or judge received a substantial contribution from a party to the case, including attorneys for the party, and all others described in subsection (b) of Section 12-24-2. This legislation in no way intends to suggest that any sitting justice or judge of this state would be less than fair and impartial in any case. It merely intends for all the parties to a case and the public be made aware of campaign contributions made to a justice or judge by parties in a case and others described in subsection (b) of Section 12-24-2."
Section 12-24-2(a), Ala.Code 1975, requires a justice or a judge, before beginning his or her term of office, to file with the secretary of state a statement disclosing the names and addresses of contributors to the justice's or judge's political campaign. Subsection (b) requires the parties in a case to file statements disclosing
"the amount, if any, of campaign contributions by the respective individual donor or entity to any justice or judge of an appellate court where the case is pending, or if it is a trial court proceeding, the amount, if any, of campaign contributions by the respective individual donor or entity to the judge presiding over the case, made in the last election by the party or real parties in interest, any holder of five percent (5%) or more of a corporate party's stock, any employees of the party acting under that party's direction, any insurance carrier for the party which is potentially liable for the party's exposure in the case, the attorney for the party, other lawyers in practice with the attorney, and any employees acting under the direction of the attorney or acting under the direction of those in practice with the attorney."
Finally, subsection (c) of § 12-24-2 requires that any justice or judge of an appellate court who has received more than $4,000, based on the information contained in the certificates of disclosure required by § 12-24-2(b), must automatically recuse himself or herself from the case.
There are several problems with Brackin's argument that these Code sections require my recusal. First, as noted above, the Alabama Banker's Association is not a party to this case, nor does it fit into any of the categories in § 12-24-2(b) that must disclose campaign contributions. Second, as noted above, the Alabama Banker's Association did not contribute to my campaign. Finally, the fact that it is questionable whether §§ 12-24-1 and -2, Ala.Code 1975, which have not yet obtained "preclearance" from the United States Justice *234 Department under the Voting Rights Act of 1965, are even enforceable has been well documented by this Court. See Ex parte McLeod, 725 So.2d 271, 274 n. 2 and n. 3 (Ala.1998); Finley v. Patterson, 705 So.2d 834, 835-36 n. 1 (Ala.1997)(Cook, J., concurring specially). Brackin does not address the issue whether these Code sections are enforceable. She even makes the baffling assertion that "[i]n fact, this Court has interpreted this section [§ 12-24-2(c)] to mean that a campaign contribution to a circuit judge in excess of $2,000 will presumptively bias a circuit court judge in the mind of the public." (Emphasis added.) In support of this statement, Brackin cites Ex parte Bryant, 675 So.2d 552 (Ala.Crim.App.1996)  an opinion issued by the Court of Criminal Appeals.[5] I am not aware of any opinions in which this Court has resolved the issue of the enforceability of §§ 12-24-1 and -2, Ala.Code 1975, and because Brackin does not attempt to address this issue, I will not attempt to resolve it here.
In sum, Brackin does not specifically argue why my disqualification is necessary under the Alabama Canons of Judicial Ethics: I did not receive any campaign contributions from the Alabama Banker's Association; the Alabama Banker's Association is not a party to this appeal; and §§ 12-24-1 and -2, Ala.Code 1975  even if enforceable  do not apply in this case. I therefore decline to recuse myself. The Canons of Judicial Ethics do not require my recusal; caselaw does not support it; and my conscience will not allow it.
NOTES
[1] Smith was a former branch manager for FSCU. Smith was accused of, among other things, selling automobiles that he personally owned to members of the credit union and providing financing to the members through the credit union. However, he was also accused of engaging in improper lending practices and making uncollectible loans on behalf of FSCU. FSCU was attempting to recover some of the losses allegedly incurred as a result of Smith's actions by filing a claim against its fidelity bond; thus, an audit was performed.
[2] The ACUA is a state agency with the authority to regulate state-chartered credit unions within the State of Alabama. § 5-17-40, Ala.Code 1975.
[3] According to Rutledge, the ACUL is a trade association funded by and for the benefit of credit union associations. It performs political advocacy and provides other services on behalf of credit unions.
[4] Rutledge acknowledged that before September 1999 she was aware that procedural problems existed at FSCU, including employees' improperly advancing due dates on loans and employees' failing to obtain proper documentation for the loan files.
[5] The phrase "advancing of a due date" refers to the manual changing of a loan payment date. Rutledge explained that when a due date is advanced by an employee of FSCU, the credit union member should always sign a loan-extension agreement to support that action. The parties sometimes refer to this same process as "file maintaining the due dates."
[6] It is clear from the record that Rutledge was unable to review all of the files in question. However, the testimony is contradictory at times as to how much of the employees' testimony Rutledge attempted to verify by checking loan files or how much of that testimony Rutledge was able to verify.
[7] According to Rutledge, Moore was the senior examiner with the ACUA, and he had authority over all other examiners. He reported to the ACUA administrator and was responsible for reviewing all of the examination reports submitted on credit unions.
[8] This is the same procedure as the "advancing of due dates" explained above.
[9] According to trial testimony, Rutledge did not hear this conversation but was simply told by Johnson that such a conversation had occurred.
[10] The events described in this last sentence did not occur until September 16, 1999, while Rutledge testified that she prepared her summary on September 11 and 12. Therefore, either this sentence must have been subsequently added to Rutledge's report or Rutledge's dates must be incorrect.
[11] At trial, Brackin's counsel argued that Rutledge's "belief" was based solely on statements made by FSCU employees. Rutledge acknowledged as much at trial.
[12] Brackin's counsel argued at trial that Johnson's purpose in seeking legal counsel was to protect herself from liability as a result of the statement she provided to Rutledge about Brackin.
[13] Brackin's counsel questioned Rutledge at trial as to why she presented this as a "fact" when she had no basis for drawing such a conclusion. Rutledge explained that she was trying to raise possible explanations for prior questionable occurrences at FSCU.
[14] According to § 5-17-8(d), Ala.Code 1975, the administrator of the ACUA is authorized to

"suspend from office and prohibit further participation in any manner in the conduct of the affairs of a credit union of ... any employee who has done any one of the following:
"(1) Committed any violation of a law, rule, or regulation.
"(2) Engaged or participated in any unsafe or unsound practice in connection with the credit union business.
"(3) Engaged in any act, omission or practice which constitutes a breach of fiduciary duty to the credit union.
"(4) Committed any fraudulent or questionable practice in the conduct of the credit union's business which endangers the credit union's reputation or threatens insolvency.
"(5) Violated any condition imposed in writing by the administrator or any written agreement with the administrator.
"(6) Concealed, destroyed, removed, falsified, or perjured any book, record, paper, report, statement, or account related to the business and affairs of the credit union."
[15] Brackin asserts that, as a result, she approached Earnestine McDonald, the chairman of the board of directors for FSCU, and Fields and asked to speak with Latham regarding the charges made against her. Brackin alleges that McDonald and Fields denied her access to Latham. Brackin claims that at that time she told McDonald and Fields

"that she was being improperly accused of transactions and irregularities which had been performed by other credit union employees. In that regard, she told them to investigate the activities of numerous FSCU employees, including John Salter, Charles Cushing, Ken Tucker, Barbara Ricks, and others, stating that they would find a wealth of improper activities. Despite [Brackin's] request, [FSCU] ignored such a warning, never bothered to investigate the truthfulness of the employee statements, and instead proceeded with a pre-determined and skewed investigation designed to use [Brackin] as a scapegoat for the wide-ranging improper lending and collection practices engaged in by other FSCU employees, as well as to protect FSCU, President Ron Fields and the Board for their failure to detect and remedy such deficiencies."
(Brackin's Brief at pp. 13-14.)
[16] Brackin was not allowed to participate in this investigation or to attend any of the meetings.
[17] Latham was the same person who instructed Fields to place Brackin on administrative leave and who participated in the investigation at FSCU on September 15 and 16, 1999.
[18] On April 14, 2000, FSCU filed a claim against its fidelity bond, claiming that, as a result of Brackin's wrongful conduct and lending violations, it had incurred a substantial loss.
[19] Section 5-17-8(k), Ala.Code 1975, provides, in part:

"The credit union or any person affected by an order may appeal by written appeal delivered to the administrator within 10 days after the issuance of an order. In the event of an appeal, a hearing shall be held before the Credit Union Board of the Alabama Credit Union Administration within 30 days of the filing of an appeal and the decision shall be rendered by the Credit Union Board within 15 days after the hearing."
[20] Other procedural facts are discussed below as they become relevant to the issues raised on appeal.
[21] Despite the fact that Brackin and Fields had entered into a pro tanto settlement and a joint stipulation of dismissal as to all claims asserted against Fields, the trial court's order on motions for a summary judgment addressed claims asserted against Fields.
[22] However, at the close of Brackin's case-in-chief, Brackin's counsel argued that the negligence claim against Rutledge and the ACUL had been tried by the evidence admitted. The trial court agreed and granted Brackin's motion to conform the pleadings to the evidence. Thus, the trial court concluded that Brackin's negligence claim against Rutledge and the ACUL was again at issue.
[23] The trial court held that, because the employees made these statements before a formal investigation or administrative proceeding began, the statements were not protected by an absolute or conditional privilege.
[24] The trial court held that Rutledge's statements were protected by conditional privilege because they were made during a quasi-judicial proceeding but that this privilege could be overcome by Brackin because Rutledge knew her statements contained partially or completely false information or, alternatively, that Rutledge acted with reckless disregard as to whether the information was completely or partially false.
[25] As noted above, the record reflects that Brackin and Fields entered into a pro tanto settlement and a joint stipulation of dismissal as to all claims Brackin asserted against Fields. The joint stipulation of dismissal does not specify whether this was intended to address the claims asserted against Fields in his individual capacity, in his official capacity with FSCU, or both.
[26] This was the exact amount of compensatory damages Brackin's counsel requested at trial.
[27] This date precedes Rutledge's September 1999 investigation at FSCU. The record contains other written summaries prepared by Bobby Chitwood, in which he details various loan transactions involving Brackin. Chitwood apparently kept a written summary of some of his experiences with Brackin and FSCU members. However, this written summary is the only one the trial court allowed to go to the jury.
[28] We recognize that Nelson, supra, Montgomery v. Big B, Inc., 460 So.2d 1286 (Ala.1984), and Reynolds Metals Co. v. Mays, 547 So.2d 518 (Ala.1989), could be construed otherwise. In those cases, the Court held that allegedly defamatory statements made in the presence of nonemployee polygraph operators and a nonemployee telegraph operator were publications, for purposes of a defamation claim. However, the Court in those opinions did not discuss or even note the agency relationship existing between the defendant corporations and the telegraph and polygraph operators.
[29] At the December 14, 1999, hearing before the ACUA, Rutledge testified as to the findings she made during the September 1999 investigation of FSCU. During that investigation, she was acting as an agent of FSCU.
[30] Additionally, Rutledge testified that she attempted to obtain verifying information. She attempted to locate the loan files; she obtained written statements from the employees; she reviewed the computer-generated reports that indicated past-due loans on which the due dates had been advanced. Rutledge did not question Brackin or Fields regarding the employees' accusations because both Brackin and Fields were out of town when Rutledge was conducting her investigation. Additionally, Rutledge testified that she did not believe it was appropriate to question Brackin or Fields because, at the time of her investigation, she did not know who might be involved in any wrongdoing. Rutledge also testified that she was concerned that such questioning would prompt the wrongdoer to take action to avoid detection.
[31] Brackin also alleged that the other employees who made accusations against her were trying to avoid detection of their own wrongdoing. However, this allegation does not support a defamation claim against Rutledge. Brackin did not assert defamation claims against the individual employees.
[32] The trial court initially entered a summary judgment for the ACUL and Rutledge on this claim; however, at the close of Brackin's case-in-chief, the trial court granted Brackin's motion to conform the pleadings to the evidence offered at trial. Upon granting that motion, the trial court restored Brackin's claim alleging that Rutledge negligently performed the investigation.
[33] On March 15, 2002, Brackin filed another motion opposing the defendants' attempts to amend their answers. However, by the time of that filing, the trial court had already issued its order denying the defendants' motions.
[34] The second amended complaint reflects a mailing date of March 13, 2002; however, the clerk's date stamp is not visible on this document. The trial court later indicated that the second amended complaint was filed on March 14, 2002.
[35] The trial court noted in its order of March 14, 2002, that the second amended complaint had been filed on that same date.
[36] Brackin asserts that the second amended complaint was filed more than eight months before the trial. This statement is partially correct. When Brackin filed her second amended complaint, the scheduled trial date was six weeks away; the trial was later rescheduled.
[1] The motion requesting my recusal appears to be addressed to the entire Court; however, recusal is a matter properly submitted first to the Justice whose recusal is sought, and only thereafter to the entire Court. See Aetna Life Ins. Co. v. Lavoie, 470 So.2d 1060, 1089 (Ala.1984), vacated on other grounds, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1996). I therefore treat this motion as one directed to me.
[2] FSCU's appeal was consolidated with an appeal by Brackin from summary judgments entered in the same case in favor of the Trimmier Law Firm, Alabama Credit Union League, and Jo Lynn Rutledge (case no. 1021005).
[3] Indeed, when I entered my vote in this case I was not aware that ALABAPAC had made a contribution to my campaign committee. Therefore, I had no knowledge of any facts that could have possibly given rise to an alleged appearance of impropriety.
[4] I further note that, if judges and justices could be automatically disqualified due to actions on the part of amici curiae, parties could manipulate the composition of the Court sitting on each case; amicus briefs are most often unsolicited by the Court, and a party could merely solicit an amicus brief by a certain entity or individual in an attempt to disqualify a specific judge or justice. This Court's alternative would be to initiate a practice of declining to accept amicus briefs, which would deprive the Court of a valuable resource for its decision-making.
[5] I also note that Brackin, in this statement, is referring to the provision of § 12-24-2(c) that requires the recusal of a circuit court judge who has received more than $2,000 based on the information contained in the certificates of disclosure, instead of the provision that requires the recusal of an appellate court judge or justice who has received more than $4,000 based on the information contained in the certificates of disclosure. Obviously, the provision pertaining to circuit court judges is not applicable to this case.