COBB, Chief Justice.
This appeal involves a negligence claim by Bradford Building Company, Inc. (Bradford), against QORE, Inc., d/b/a QORE Property Sciences (“QORE”). Bradford’s claims arise out of the failure of a concrete slab during the construction of a building on the slab. The slab failed because it was built over an excavated fuel-tank pit that had been filled with material that was not properly compacted. QORE appeals from the Jefferson Circuit Court’s denial of its motion for a judgment as a matter of law. We affirm.

Facts and Procedural History

When, as in this case, an appellant challenges a trial court’s ruling on a motion for a judgment as a matter of law, the appellate court views the evidence in the light most favorable to the nonmovant. Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003). Therefore, with regard to facts as to which evidence or testimony was in conflict at trial, the Court has set out those facts in the light most favorable to Bradford, the nonmovant.

A. Purchase of Property

In December 2004, RKM Leeds, LLC (“RKM”), purchased a painel of real property from JDW Properties I, LLC (“JDW Properties”). RKM intended to construct a building to house a Walgreens pharmacy on the site and then to sell the developed *1119 property to Walgreen Company. Before the sale of the real property, a gasoline service station had been operating on the property. Under the contract for the sale of the property, JDW Properties was to remove the underground fuel-storage tanks and related fuel lines from the property, and RKM was responsible for placing and compacting fill in the pits left by the removal of the fuel-related equipment.

B. Gallet Report

In May 2005, RKM hired Gallet & Associates, Inc. (“Gallet”), to determine whether subsurface conditions would provide the necessary structural support for the Wal-greens store. Gallet investigated the site and, on June 15, 2005, provided RKM a report of its results (“the Gallet report”). In its report, Gallet noted that the “store will be located at the site of an existing gas station.” Gallet recommended that “[t]he existing ... buried utilities (including existing fuel product lines and underground storage tanks) should be excavated from the proposed building and parking areas.”
Because excavating the tanks would create pits at least 15 feet deep, the Gallet report recommended that these “abandoned tank pits should be backfilled with engineered fill.” “Engineered fill” is fill that has been tested by an engineering firm and deemed suitable for use as structural fill and that has been properly installed and compacted. The Gallet report specified that,
“[i]n building areas, structural fill should be extended a minimum of 5 feet outside all building lines, paved areas, and slopes. The fill should be placed in thin loose lifts not exceeding 8 inches in thickness and compacted accordingly.”
Soil compaction is performed by placing appropriate fill material in thin layers and compressing each layer with a roller or other compacting machinery before adding the next layer. Fill is compacted to prevent settling of the soil over time, which can undermine the structural integrity of buildings constructed over the settling soil.
The Gallet report also recommended that, after the site had been excavated, backfilled, and graded, but before the placement of any extra fill to raise the grade to the specifications in the building plans, “the exposed subgrade should be thoroughly proof rolled.” “Proof rolling” is a process in which the surface of the soil is carefully observed as a fully loaded tandem-axle dump truck is driven over it. Any soft or structurally unsound soils revealed by the proof rolling are undercut and replaced with suitable well compacted engineered fill. Proof rolling does not detect structurally unsound soils or subsurface conditions at depths greater than roughly three feet below the surface.

C. QORE/RKM Contract

After the Gallet report had been submitted, RKM hired QORE to perform construction-materials-testing (“CMT”) services related to site grading and building construction. The contract entered into between QORE and RKM stated that the scope of CMT services to be performed by QORE “will be in accordance with the Master Work Scope of CMT Services requested by Walgreen! ] Company and Wal-greens’ Criteria Specification Fiscal 2005.”
The “Master Work Scope of CMT Services requested by Walgreen! ] Company” included the following “soils testing and site preparation” services:
“ — Standard Proctor [a soil-compaction test]
“ — Modified Proctor [a soil-compaction test]
“ — -Nuclear Gauge fa soil-density test]
“ — Compaction Control Testing
*1120 “ — Compaction and Proof Roll Observation
“ — Review of Soil Boring Report and Bearing Capacities.”
The “Walgreens Criteria Specifications, Fiscal 2005” (“the Walgreens specifications”) included a schedule of “inspections, tests, and similar services representing] the minimum scope of quality control services to be performed,” including the following:
“Verify suitable soil bearing capacity
“Field density testing, compaction testing
“Optimum moisture/maximum density testing
“Pavement proof rolling
“Pavement Surface Smoothness Testing”
The Walgreens specifications also set forth specific requirements for “Site-work/Excavation,” including the following:
“Testing: ....
“1. Soil reports of actual unconfined compressive strength of each strata tested. Verify soil/fill bearing capacity conforms to design requirements. Perform one test at each column pad and per each 50 1ft. of foundation....
“5. Final building pad verification letter, submitted by the Geotechnical Engineer at the completion of Grading operations, summarizing satisfactory completion of all tests performed prior to slab placement.”
Further, the Walgreens specifications incorporated the Gallet report. Colin Se-well, project manager for QORE, testified at trial that part of QORE’s responsibility was to ensure that the recommendations in the Gallet report were followed.
In addition to providing that QORE’s services would “be in accordance with the Master Work Scope of CMT Services requested by Walgreen[ ] Company and Wal-greens’ Criteria Specification Fiscal 2005,” the contract between QORE and RKM also stated:
“The following list of construction materials testing was provided to us [i.e., QORE] by Walgreen[ ] [Company] during the CMT selection and we consider it to be the master scope of services. This scope includes requirements in the Project Specifications Manual.
“I. Earthwork
“ — Density testing of mass fill and utility trench backfill...
“ — Evaluation of soil subgrades prior to fill placement...
“ — Standard Proctor compaction tests, where required...
“ — Modified Proctor tests, where required (does not currently apply)
“ — Nuclear gauge density testing, if required
“ — Review of geotechnical subsurface exploration report [the Gallet report]
[[Image here]]
“We will perform our evaluations and tests in general accordance with the project specifications and applicable standards of the industry in the local area of the project. Our personnel do not have the authority to direct the contractor or his subcontractors in the performance of their work or to authorize changes in the construction contract. We will, however, bring to their attention any observations or test results that indicate noncompliance with the contract documents. We point out that the tests will be performed on a random basis and they are not a guarantee of the work in accordance with the construction documents ....
“Standard of Care. The [CMT] Services [provided by QORE] will be performed in accordance with the standards cus *1121 tomarily provided by a firm rendering the same or similar services in the same geographic region during the same time period.”

D. Bradford, RKM’s General Contractor

On September 8, 2005, RKM entered into a contract with Bradford pursuant to which Bradford was to serve as general contractor for the construction of the Wal-greens drug-store building. Bradford had built Walgreens stores for RKM on previous occasions. For the construction project at issue in this case, Bradford subcontracted the grading work on the site to Borden & Brewster Contractors, Inc. (“B & B”).
Bradford undertook the responsibility to inform QORE of the progress of the construction. However, Bradford’s personnel did not know what construction-materials tests needed to be performed, and, as the general contractor, Bradford did not undertake any responsibility to direct QORE as to which tests to perform. Rather, as the firm that was to perform the CMT services for the project, QORE was responsible for determining what tests to perform at each of the various stages of construction and to send an engineer or technician, as appropriate, to perform those tests at the proper times.

E. Improper Backfilling

JDW Properties or a related entity[1] entered into a contract with CDG Engineers & Associates, Inc. (“CDG”), to remove the underground storage tanks and fuel lines from the site. CDG subcontracted the work to Milam & Co. Construction, Inc. (“Milam”).
On the morning of October 11, 2005, B & B’s general superintendent, Donald Edwards, visited the construction site to observe the progress of Milam’s underground-storage-tank-removal work. Edwards noticed that Milam had not compacted the fill dirt that was being placed in the large pits left by the removal of the underground storage tanks. Edwards telephoned Bradford’s project manager, Michael Cahoon, to inform him that Milam’s dump trucks were dumping loose fill into the pits where the fuel tanks had been and that he saw no compaction equipment at the site.
Cahoon went to the site and saw that the backfilling was not being done properly. Edwards and Cahoon were concerned that settling problems could develop if the Walgreens drug-store building was built over the improperly backfilled pits. Ca-hoon immediately telephoned RKM to inform RKM of the problem. RKM instructed Cahoon to telephone CDG and Milam, the contractor and subcontractor performing the tank-removal work, and Cahoon did so. Both CDG and Milam assured Cahoon that they would compact the fill in the fuel-tank pits.
RKM also instructed Cahoon to call QORE about the matter. At 12:44 p.m. and again at 1:03 p.m. on October 11, 2005, shortly after speaking with representatives of CDG and Milam about the improper backfilling of the pits left by the removal of the underground tanks, Cahoon telephoned QORE and informed QORE of the improper backfilling of the pits. Thereafter, Bradford relied on QORE to verify that the backfill in the pits had been properly compacted so that the bearing capacity of the soil was sufficient to support the *1122 Walgreens store building to be constructed on the site.

F. QORE’s Subgrade Evaluation

By early November 2005, Bradford and B & B had begun work at the site. The site had been stripped of all asphalt, concrete, debris, and vegetation, but Bradford and B & B had not begun to place fill on the site to level the surface to the specified grade. Bradford and B & B relied on QORE to test the existing soil and to inform them whether the soil met the necessary criteria before they began placing fill to level the site or proceeded with construction of the Walgreens building. Colin Sewell, an engineer in training and project manager for QORE, traveled to the project site to perform a “subgrade evaluation” to determine whether the soil met specifications and would support the slab and ultimately the building.
It is undisputed that the only test Sewell performed at the site was a proof roll. During this test, Sewell identified several areas where the proof roll revealed that the ground was too soft or was unsuitable for building, and these areas were corrected. Sewell knew the site had formerly been used for a gasoline station. He had read the Gallet report and was familiar with its recommendation that the fuel tanks and fuel lines be removed and that properly compacted engineered fill be placed in the pits left by their removal. Sewell asked the B & B representative at the site where the pits had been located, but the B & B representative did not know. Sewell made no further attempts to locate and specifically test the fill material in the tank pits.
Frank Upchurch, a materials engineer who testified at trial as an expert witness for Bradford, testified that, if QORE had performed density tests on the fill, a sub-grade evaluation, and other tests specified in QORE’s contract with RKM, QORE would have detected that the material in the tank pits had not been properly compacted before Bradford began to build. According to Upchurch, the proof roll QORE performed was not sufficient to satisfy QORE’s obligation to verify that soil in the tank pits met the density and compaction specifications for the construction project or that it would support the slab. Upchurch further testified that, by performing only a proof roll, QORE did not meet the standard of care set forth in its contract with RKM. According to Up-church, performing the testing procedures and fulfilling the obligations specified in the contract in accordance with the standard of care would have required QORE (1) to ask further questions and to perform further research to determine the location of the tank pits and whether the tank pits had been properly backfilled and compacted; (2) to ask to review the results of any existing soil-compaction tests of the tank-pit areas; and (3) to perform any drilling, field-density, or compaction tests needed to verify that the soil in the tank pits met the project specifications and would bear the load of the planned construction.
According to Upchurch, if QORE was unable to locate and test the tank pits, QORE should have informed RKM and Bradford that it could not verify the suitability of the fill in the tank pits and warn them that, if the tank pits were not properly filled and compacted, the building could settle and sustain damage.

G. Failure of the Slab

After QORE performed the proof roll, Bradford built a concrete slab on the site to serve as the foundation for the Wal-greens drug-store building. However, because the soils in the tank pits had not been properly backfilled, they began to settle, causing the slab to break. Brad *1123 ford made the necessary repairs, which it paid for. Bradford presented evidence indicating that repairing the slab cost $223,000 and that Bradford would have incurred no expense if QORE had discovered the problem with the fill material in the tank pits before Bradford built the slab. At trial, a representative of Bradford testified that Bradford made “a business decision” to pay those costs, because, at the time, it was unclear who, if anyone, was at fault for the broken slab or why the slab failed, because Bradford had a contractual duty to RKM to construct a slab on which a store building could be constructed, and because Bradford risked failing to meet its contractual obligations and damage to its business relationships with RKM and Walgreens if the broken slab was not corrected and the store was not able to open on time.

H. Court Proceedings

On October 27, 2006, Bradford filed the underlying action. On January 8, 2008, the trial court entered judgment on a jury verdict finding QORE liable to Bradford in negligence and awarding Bradford $196,937.96. QORE moved for judgment as a matter of law, arguing that Bradford had not presented substantial evidence of any of the elements of its negligence claim. On February 25, 2008, the trial court denied the motion. On March 18, 2008, QORE filed a notice of appeal from the denial of its motion for a judgment as a matter of law.

Standard of Revieiu

“When reviewing a ruling on a motion for a JML [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to with1 stand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Fla., 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).

Analysis

QORE argues that the trial court erred in denying QORE’s motion for a judgment as a matter of law because, according to QORE, Bradford did not present sufficient evidence of any of the elements of a negligence claim. “In a negligence action the plaintiff must prove (1) that the defendant owed the plaintiff a duty; (2) that the defendant breached that duty; (3) that the plaintiff suffered a loss or injury; and (4) that the defendant’s breach was the actual and proximate cause of the plaintiffs loss or injury.” DiBiasi v. Joe Wheeler Elec. Membership Corp., 988 So.2d 454, *1124 460 (Ala.2008) (citing Ford Motor Co. v. Burdeshaw, 661 So.2d 236, 238 (Ala.1995)).

A. Duty and Breach

In Harris v. Board of Water & Sewer Commissioners of Mobile, 294 Ala. 606, 613, 320 So.2d 624, 630 (1975), this Court held that “where one party to a contract assumes a duty to another party to that contract, and it is foreseeable that injury to a third party — not a party to the contract — may occur upon a breach of that duty, the promissor owes that duty to all those within the foreseeable area of risk.” A breach of such a duty that results in injury to a third party who is “within the foreseeable area of risk” is actionable negligence. Id.
According to QORE, Bradford did not meet its burden of presenting substantial evidence indicating that QORE had a duty to perform any test other than a proof roll before Bradford poured the concrete slab foundation for the Walgreens building. However, according to the testimony of Bradford’s expert, had QORE performed the tests specified in its contract with RKM in accordance with the standard of care specified in the contract, either QORE would have verified that the soil in the tank pits met the project specifications and that it would support the building to be constructed on the property or it would have alerted RKM and Bradford that it was not possible to determine whether the soil in the tank pits would support the building.[2]
It is undisputed that QORE did not locate and test the fill material in the tank pits or inform Bradford and RKM that it was unable do so. Thus, the evidence presented at trial was sufficient to send to the jury the question whether QORE owed and breached a contractual duty to verify that the soil in the tank pits met the project specifications and that it would support the building to be constructed on the property or to warn that the appropriate tests had not been performed and that the building could fail. The trial court did not err in submitting those issues to the jury.

B. Reasonable Reliance

Even when a third party is not in privity with the parties to a contract and is not a third-party beneficiary to the contract, the third party may recover in negligence for breach of a duty imposed by that contract if the breaching party negligently performs the contract with knowledge that others are relying on proper performance and the resulting harm is reasonably foreseeable. Cincinnati Ins. Cos. v. Barber Insulation, Inc., 946 So.2d 441, 446-47 *1125 (Ala.2006). Citing Cincinnati, supra, QORE argues that it was entitled to a judgment as a matter of law because, according to QORE, Bradford did not meet its burden of presenting substantial evidence indicating that it reasonably relied on QORE to verify whether the soil in the tank pits was suitable to support the weight of the Walgreens building.
However, Bradford presented evidence indicating that QORE, as the firm hired to perform CMT services, was hired for the benefit of the construction project as a whole. According to one of the experts who testified at trial, it is general practice in the construction industry that “everyone that’s working on the project is intended to benefit” from the CMT services performed by the firm hired to perform those services, whether they are a party to the contract or not, and that it is reasonable and generally expected that all contractors working on the project will rely on that firm’s CMT services rather than hire an independent firm to do the same work for the contractor’s benefit. Further, Michael Cahoon testified at trial that, in his experience as a manager for a general contractor, it is generally expected that the firm performing the CMT services will verify that the recommendations in the geotechnical report (such as the Gallet report) are followed and that project specifications have been met. Bradford further presented evidence indicating that it had made QORE aware of the need to verify that the soil in the tank pits was properly compacted, that QORE had a contractual duty to so verify, and that Bradford was relying on QORE to perform its duty so that the building would not fail because of subsurface settling in the tank pits.
The above evidence is sufficient to create a genuine issue of fact so that the trial court properly submitted the case to the jury to decide whether Bradford had reasonably relied on QORE to verify that the soil in the tank pits would bear the weight of the Walgreens building.

C. Proximate Cause

To overcome a motion for a judgment as a matter of law in a negligence action, the plaintiff must present substantial evidence indicating that the defendant’s acts or omissions proximately caused the plaintiffs injury. See Brackin v. Trimmier Law Firm, 897 So.2d 207, 226 (Ala.2004). QORE argues that it was entitled to a judgment as a matter of law because, according to QORE, Bradford did not meet its burden of presenting substantial evidence indicating that the failure of the slab was proximately caused by QORE’s failing to verify whether the soil in the tank pits would support the Wal-greens building. Rather, according to QORE, Bradford’s decision to pay to correct the underlying soil condition and to repair the slab was an independent cause of Bradford’s injury because, QORE contends, Bradford was not contractually obligated to incur those costs.
Other than general propositions of law that provide no support for its argument, QORE cites no cases to substantiate its theory that Bradford’s fixing the problem with the slab at its own expense was a voluntary, unforeseeable act that broke the chain of proximate causation. “ ‘Authority supporting only “general propositions of law” does not constitute a sufficient argument for reversal.’ ” Walden v. Hutchinson, 987 So.2d 1109, 1121 n. 4 (Ala.2007) (quoting Beachcroft Props., LLP, 901 So.2d 703, 708 (Ala.2004), quoting in turn Geisenhoff v. Geisenhoff, 693 So.2d 489, 491 (Ala.Civ.App.1997)). Therefore, we will not consider QORE’s argument that the trial court erred in not finding that the chain of causation was broken. See City of Birmingham v. Busi *1126 ness Realty Inv. Co., 722 So.2d 747, 752 (Ala.1998) (“When an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court’s duty nor its function to perform an appellant’s legal research.” (citing Rule 28(a)(5), Ala. R.App. P.; Spradlin v. Birmingham Airport Auth., 613 So.2d 347 (Ala.1993))).

D. Contributory Negligence

QORE argues that it was entitled to a judgment as a matter of law because, according to QORE, Bradford was contributorily negligent, as a matter of law. A plaintiff who negligently contributes to his own injury cannot recover in a negligence action, notwithstanding a showing that the defendant was also negligent. Hannah v. Gregg, Bland & Berry, Inc., 840 So.2d 839, 860-61 (Ala.2002). To establish contributory negligence as a matter of law, a defendant must demonstrate that the plaintiff put himself at risk of being injured and that the plaintiff had a conscious appreciation of that risk at the moment the incident occurred. Id.
In support of its argument, QORE points out that Michael Cahoon had observed CDG and Milam improperly back-filling the tank pits and that Cahoon testified that, “in hindsight,” it had been a mistake to trust CDG and Milam to properly compact the soil in the tank pits and to rely on QORE to verify that the soil in the tank pits had been suitably compacted.
However, as discussed, supra, it was not unreasonable for Bradford to inform QORE of the problem and to thereafter rely on QORE to verify that the soil in the tank pits had been sufficiently compacted and to alert Bradford if the material did not meet the project specifications. The record contains sufficient evidence from which a jury could reasonably conclude that, at the time Bradford constructed the slab, Bradford had not consciously placed itself at risk of being harmed. Ca-hoon’s testimony that, in hindsight, it had been a mistake to rely on QORE does not entitle QORE to judgment as a matter of law that Bradford was contributorily negligent.

E. Damages

At trial, the parties stipulated that the appropriate measure of compensatory damages in this case was the amount of money that would place Bradford in the same condition it would have occupied had QORE not breached its contractual obligations to RKM. See Poffenbarger v. Merit Energy Co., 972 So.2d 792, 801 (Ala.2007) (“Compensatory damages should indeed be adequate to make the victim whole.”); cf. Wal-Mart Stores, Inc. v. Bowers, 752 So.2d 1201 (Ala.1999) (discussing the proper measure of damages in negligence actions when the only injury is damage to property). QORE argues that it was entitled to a judgment as a matter of law because, according to QORE, Bradford did not present substantial evidence of what Bradford would have paid to correct the soil in the tank pits if QORE had detected the unsuitability of the fill before Bradford built the slab.
However, Bradford presented evidence indicating that, if QORE had not breached its contract with RKM, the problem would have been corrected before Bradford built the slab, and Bradford would not have been placed in the position of paying for any repairs to the slab or for bringing the tank pits to project specifications in order to fulfill its obligations as general contractor and to protect its business relationships. Bradford also presented evidence that it incurred costs of $223,000 to repair the slab. Thus, the evidence was sufficient to warrant a jury’s *1127 determination as to the amount of Bradford’s damages.

Conclusion

For the reasons stated above, the trial court did not err in denying QORE’s motion for a judgment as a matter of law. We affirm.
AFFIRMED.
LYONS, WOODALL, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
MURDOCK, J., concurs in the rationale in part and concurs in the result.

. The record is conflicting as to whether JDW Properties, its owner, or a related business entity entered into the contract hereinafter described for removal of the fuel tanks and related work.

. Much of the testimony Bradford presented in relation to the scope of QORE's duties under its contract with RKM was offered through Bradford’s expert. QORE argues that Bradford's expert should not have been permitted to testify at trial regarding the scope of QORE's contractual duties. According to QORE, such testimony went beyond merely offering expert testimony regarding the meaning of technical and trade terms in the contract and instead encroached on the trial court's duty to construe the contract as a matter of law. QORE filed a motion in limine on this issue, which was denied. However, QORE did not object during the trial to the introduction of the challenged evidence, and it cites no portion of the record indicating that it obtained the express acquiescence of the trial court that such an objection at trial was unnecessary. Likewise, our review of the record has revealed no such acquiescence. Therefore, we will not address the issue because QORE did not preserve it for appellate •review. See Owens-Corning Fiberglass Corp. v. James, 646 So.2d 669, 673 (Ala.1994) (holding that this Court will not review an adverse ruling on a motion in limine, absent proper objection at trial or the trial court's express agreement that such an objection is not necessary).