[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-12886

_____

ARTUR DAVIS,

Plaintiff-Appellant
Cross Appellee,

*versus*

LEGAL SERVICES ALABAMA, INC.,
LAVEEDA MORGAN BATTLE,
ALEX SMITH,

Defendants-Appellees
Cross Appellants.

—————————————

Appeals from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:18-cv-00026-RAH-JTA

—————————————

Before ROSENBAUM and TJOFLAT, Circuit Judges, and STEELE,[*] District Judge.

PER CURIAM:

Artur Davis appeals the district court's order granting summary judgment in favor of Defendants, Legal Services Alabama, Inc. ("LSA"), and two members of its Board of Directors, LaVeeda Morgan Battle and Alex Smith. Specifically, Davis contends that the district court erred in holding that, as a matter of law, the paid suspension to which LSA subjected Davis could not constitute an adverse employment action for purposes of his race-discrimination claim and that Davis had not raised a genuine dispute of material fact on whether he was constructively discharged. Davis also argues that the district court erred in holding that LSA's sharing of information with a consultant it hired could not constitute publication for purposes of a state-law defamation claim. For their part, Defendants cross-appeal the district court's failure to award them costs. For the reasons that follow, we affirm the district court's

———————————

[*] Honorable John E. Steele, United States District Judge for the Middle District of Florida, sitting by designation.

judgment and dismiss the cross-appeal as premature.

## I.[1]

Plaintiff-Appellant-Cross-Appellee Davis is a former Congressman, candidate for mayor of Montgomery, Alabama, candidate for governor of Alabama, and federal prosecutor. He is Black. In 2016, he applied for and obtained the position of Executive Director of LSA, a non-profit law firm providing civil legal services for low-income Alabamians.

During the course of his work with LSA, Davis began experiencing problems with some of his subordinates and colleagues. Some of these employees complained about Davis to LSA's Executive Committee.

On August 18, 2017, as Davis left work, Battle and LSA Board Vice Chair Smith approached him. They informed Davis that the Executive Committee of the Board had voted to suspend him with pay pending an investigation of the complaints against him. Along with this news, they delivered to Davis a copy of the Committee's resolution suspending him (the "Resolution") and a letter outlining the reasons for the suspension (the "Suspension Letter"): (1) spending decisions outside the approved budget; (2)

---

[1] Since we are reviewing an order granting summary judgment, we view the evidence and draw all reasonable inferences from it in the light most favorable to the nonmoving party—here, Davis. *Lewis v. City of Union City,* 934 F.3d 1169, 1179 (11th Cir. 2019). For that reason, the actual facts may or may not be as described in this opinion.

failure to follow LSA policies and procedures when hiring new staff; (3) creating new initiatives without Board approval; and (4) creating a hostile work environment for some LSA employees.

After that, Davis learned that LSA had taken other steps related to his suspension, including posting a security guard in front of its building and hiring David Mowery, an Alabama political consultant, to handle public relations related to Davis's suspension. Davis and Mowery did not have a good relationship because Mowery had handled one of Davis's failed political campaigns until their relationship soured. After that, Mowery had worked for the campaign of Davis's opponent in another race. According to Battle, LSA was unaware of the history between the two men when it hired Mowery. LSA gave copies of the Resolution and the Suspension Letter to Mowery.

Four days after he was advised that he was being placed on paid suspension, on August 22, 2017, Davis sent word to the Board that he intended to resign from his position as Executive Director, effective September 23, 2017.

Davis filed suit against LSA, Battle, and Smith. The amended complaint stated eight causes of action. As relevant here, they included race discrimination under § 1981 against all defendants; race discrimination under Title VII against LSA; and defamation counts against Battle, Smith, and LSA.

Among other bases for his claims of race discrimination, Davis asserted that LSA's prior Operations Director and its prior

Executive Director, both white, had been treated more favorably than he had, and that they had participated in worse alleged misconduct. The former Operations Director allegedly had engaged in abusive behavior towards subordinates, but LSA took no action against her before she left. And the prior Executive Director allegedly had made sexually harassing remarks to female employees and had abused mileage expenses before he resigned. Neither was placed on suspension before leaving.

Following discovery, Defendants moved for summary judgment on all Davis's claims.

The district court granted the motion. As relevant on appeal, it held that, as a matter of law, Davis was not subjected to an adverse employment action, and that circumstance was fatal to his discrimination claims. More specifically, the court held both that being placed on paid leave was not an adverse employment action and that Davis had not raised a fact issue on his claim that he had been constructively discharged.

The district court also granted summary judgment as to Davis's defamation claims, holding that, under Alabama law, the complained-of disclosure (LSA's provision to Mowery of the Resolution and Suspension Letter) could not constitute "publication"—an essential element of defamation.

The district court entered a final judgment on July 16, 2020. Davis timely filed a notice of appeal. Davis appeals the district

20-12886            Opinion of the Court                    6

court's summary-judgment rulings with respect to his discrimination and defamation claims.

After Davis filed his notice of appeal, Defendants filed a Bill of Costs in the district court. The day after filing their Bill of Costs, Defendants filed their own notice of appeal, complaining of the district court's failure to award them costs.

## II.

We review *de novo* a district court's grant of summary judgment, using the same legal standards the district court must apply. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1263 (11th Cir. 2010). Summary judgment is appropriate when the movant shows no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In determining whether the movant has met this burden, courts must view the evidence in the light most favorable to the non-movant. *Alvarez*, 610 F.3d at 1263–64.

When a movant shows that no genuine dispute of material fact exists, the burden shifts to the non-movant to demonstrate a genuine issue of material fact that precludes summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-movant must go beyond the pleadings and present competent evidence of specific facts to show that a genuine issue exists. *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004).

## III.

## A. LSA did not subject Davis to an adverse employment action

Title VII of the Civil Rights Act prohibits employers from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment" because of that individual's race. 42 U.S.C. § 2000e-2(a)(1). Section 1981 similarly prohibits race discrimination in employment. 42 U.S.C. § 1981. Claims of race discrimination under both Title VII and § 1981 require a showing that the employer subjected the employee to an "adverse employment action."[2] *Quigg*, 814 F.3d at 1235 (recognizing that a Title VII claim requires an adverse employment action); *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1283 n.3 (11th Cir. 2018) (recognizing that Title VII claims and § 1981 claims

---

[2] Davis complains that the district court improperly applied the *McDonnell Douglas* framework when evaluating his race-discrimination claim because his claim was a "mixed-motive" claim. *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). We need not decide whether, in fact, his claim was a mixed-motive one because it makes no difference to the outcome here. To be sure, the *McDonnell Douglas* framework does not apply in a mixed-motive case. *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016). But a mixed-motive plaintiff—that is, a plaintiff who claims that another factor and unlawful discrimination contributed to the employer's decision to take adverse employment action—must show "(1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment action." *Id.* (alteration in original). Because the correct framework for a mixed-motive claim also requires the employee to establish he was subjected to an adverse employment action and because the district court granted summary judgment on solely the basis that Davis failed to show an adverse employment action, any error by the district court in applying *McDonnell Douglas* was harmless.

"have the same requirements of proof and utilize the same analytical framework") (citation omitted).

When, as here, we are not talking about a hostile-work-environment claim, adverse employment actions include "tangible employment actions," which are those actions "that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020).

Davis appeals the district court's conclusion that suspension with pay pending an investigation categorically does not constitute an adverse employment action and its holding that Davis was not subjected to a constructive discharge.

    i.    *Davis's paid suspension here was not an adverse employment action*

Whether suspension with pay can rise to the level of an adverse employment action in discrimination cases appears to be an

20-12886               Opinion of the Court                 9

issue of first impression in this Circuit.[3]  Many of our sister circuits, however, have already addressed the issue.

No Circuit has held that a simple paid suspension, in and of itself, constitutes an adverse employment action.  *See Joseph v. Leavitt*, 465 F.3d 87 (2d Cir. 2006) (holding that paid leave there did not constitute an adverse employment action but leaving open the possibility that a paid suspension or accompanying investigation carried out in an exceptionally unreasonable or dilatory way may constitute an adverse employment action); *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323 (3d Cir. 2015) (same); *Von Gunten v. Maryland*, 243 F.3d 858 (4th Cir. 2001) *abrogated on other grounds by Burlington N.*, 548 U.S. at 68 (holding that, categorically, paid suspension or leave is not an adverse employment action); *Breaux v. City of Garland*, 205 F.3d 150 (5th Cir. 2000) (same); *Peltier v. United States*, 388 F.3d 984 (6th Cir. 2004) (same); *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772 (7th Cir. 2007) (same); *Pulczinski v.*

---

[3] We have previously acknowledged that paid suspension may constitute an adverse employment action in the *retaliation* context. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993) ("In August of 1990, plaintiff was the subject of an adverse employment action; he was suspended with pay for thirty days.").  The standard to show an adverse employment decision in a retaliation case is more relaxed, with the employee having to show only that the mistreatment "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  But we have held that a five-day suspension with pay pending an investigation, without more, is not an adverse action for purposes of a First Amendment retaliation claim. *Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1379 (11th Cir. 2021).

*Trinity Structural Towers*, Inc., 691 F.3d 996 (8th Cir. 2012) (same); *Haddon v. Exec. Residence at White House*, 313 F.3d 1352 (Fed. Cir. 2002) (same).

We agree with our sister Circuits that a simple paid suspension is not an adverse employment action. A paid suspension can be a useful tool for an employer to hit "pause" and investigate when an employee has been accused of wrongdoing. And that is particularly so in a case like this one—where the employee under investigation is in charge of all the employees who are the witnesses. As a practical matter, employers cannot expect employees to speak freely to investigators when the person under investigation is looking over their shoulders. Employers should be able to utilize the paid-suspension tool in good faith, when necessary, without fear of Title VII liability.

Davis does not disagree that a simple paid suspension does not rise to the level of an adverse employment action. Rather, he asserts that the manner in which his suspension was handled, and the circumstances that accompanied it, combined to amount to an adverse employment action. We therefore must consider whether the circumstances here escalated Davis's paid suspension to an adverse employment action. We conclude they did not.

Davis maintains that the following circumstances made his paid suspension atypical and caused it to constitute an adverse employment action: (1) LSA disclosed the suspension to Mowery; (2) the suspension occurred days before a high-profile LSA reception with the state bar; (3) LSA compiled a narrative of reasons for the

suspension in the Suspension Letter; and (4) LSA placed a guard in the building in the aftermath of the suspension. Davis also argues that because he was the Executive Director, he served as the public face of LSA. And as a result, Davis asserts, the paid suspension was more adverse to him than it would be to a low-level employee.

We disagree. Davis has offered no evidence that LSA purposely hired Mowery because of the bad blood between Mowery and Davis or intentionally timed the suspension with the state bar event to embarrass Davis. And as we explain in Section III.B, on this record, we cannot conclude that LSA's disclosure of the suspension to Mowery was improper or otherwise punitive. The record likewise contains no evidence that placing a guard at the building after a suspension was out of the ordinary for LSA. And it is perfectly reasonable that LSA would compile its reasons for the suspension in a document to give to Davis to avoid any accusations of arbitrariness. Last, Davis has offered no authority, and we have found none, to support the notion that whether an action constitutes an adverse employment action should depend on whether the employee is high-ranking in the organization. Put simply, the circumstances of Davis's paid suspension do not rise to the level of an adverse employment action.

### ii.    *Davis was not constructively discharged*

Davis next argues that, even if his paid suspension does not amount to an adverse employment action, his alleged constructive discharge does. Under Title VII, a constructive discharge is tantamount to an actual discharge, so it constitutes an adverse

employment action. *Green v. Brennan*, 578 U.S. 547, 555 (2016); *see also id.* at 560 ("The whole point of allowing an employee to claim 'constructive' discharge is that in circumstances of discrimination so intolerable that a reasonable person would resign, we treat the employee's resignation as though the employer actually fired him."); *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1300–01 (11th Cir. 2005) ("Constructive discharge negatively affects an employee's job status, and therefore constitutes an adverse employment action."). Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job. *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009).

The district court held that Davis abandoned his constructive-discharge claim when he failed to address the Defendants' argument that Davis's voluntary resignation meant there could be no constructive discharge as a matter of law. Nevertheless, the district court went on to hold that, even if Davis had not abandoned the claim, LSA was still entitled to summary judgment on Davis's theory of constructive discharge. We do not address the district court's holding on abandonment because its ultimate conclusion that Davis was not constructively discharged was correct, in any case.

The district court held that "a Title VII constructive discharge claim generally cannot be based upon an employee's resignation under the subjective belief that an investigation would be

unfair or unjust." To support this conclusion, the district court relied on *Hargray v. City of Hallandale*, 57 F.3d 1560 (11th Cir. 1995).

We do not agree that *Hargray* is instructive in this regard. Rather, *Hargray* is about whether a resignation from public employment that had been requested by the employer was sufficiently involuntary to trigger the protections of the Due Process Clause. *Id.* at 1567–68.

Davis correctly points out in his brief that "whether a government entity's conduct violates a litigant's constitutional rights . . . is a more demanding standard than whether a litigant advances to the post prima facie stage, or its equivalent, in an employment lawsuit." Appellant's Brief at 20–21. The district court did apply too exacting a standard to determine whether Davis had raised an issue of fact on whether he was constructively discharged. Instead, the correct standard is the one articulated in *Green*: whether the employee can demonstrate that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign. 578 U.S. at 555.

Nevertheless, the district court arrived at the correct ultimate conclusion. And we may affirm on any basis in the record, even if the district court did not actually rely on that basis. *Henley v. Payne*, 945 F.3d 1320, 1333 (11th Cir. 2019).

Even under the proper, more relaxed standard, no reasonable factfinder would conclude that a reasonable person would have felt compelled to resign under Davis's circumstances. Instead,

Davis offered evidence of unpleasant disputes and disagreements with coworkers who then filed complaints against Davis. The evidence does not paint a picture of intense, intolerable harassment usually seen in cases of constructive discharge. And because paid suspension alone is not an adverse employment action, an employee's resignation in response to it cannot be an adverse employment action, either. Nor did Davis give LSA the chance to remedy any allegedly intolerable working conditions because he notified LSA of his intention to resign so soon after the suspension—within four days. *See Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) ("A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation.").

For these reasons, Davis failed to establish that he had suffered any adverse employment action. As a result, his substantive discrimination claims necessarily failed, and the district court's grant of summary judgment on them was appropriate.[4]

---

[4] Davis also complains that the district court ruled that race was not a motivating factor in any adverse employment action taken against Davis. But while the district court did acknowledge that Davis's response to the motion for summary judgment "maintain[ed] that there [was] ample evidence that race was a motivating factor in [Davis's] suspension," it nonetheless decided to "confine its inquiry . . . strictly to whether there was an actionable adverse employment action." ECF No. 49 at 19–20. For that reason, no holding on motivation is before this Court, and we offer no opinion on it.

B. *The LSA's disclosure of the Resolution and Suspension Let-*
   *ter to Mowery did not amount to publication under Ala-*
   *bama law*

Next, Davis appeals the district court's conclusion that he failed, as a matter of law, to meet the publication element of his defamation claim. Davis contends that Defendants defamed him when they gave the Resolution and Suspension Letter to Mowery. For its part, LSA asserts that it provided Mowery with the documents so Mowery could provide public-relations guidance concerning Davis's suspension.

Under Alabama law, a defamation plaintiff must establish all the following to set forth a defamation claim: (1) the defendant was at least negligent (2) in publishing (3) a false and defamatory statement to another; (4) that statement concerned the plaintiff; and (5) the claim is actionable either without having to prove special harm or upon allegations and proof of special harm. *Gary v. Crouch*, 867 So. 2d 310, 315 (Ala. 2003).

The district court held that LSA's provision of the documents to Mowery did not constitute publication because Mowery was acting as LSA's agent at the time of the disclosure. In so holding, the court relied on *Brackin v. Trimmier L. Firm*, 897 So. 2d 207 (Ala. 2004). There, the Family Security Credit Union ("FSCU") identified various improprieties related to a former employee. *Brackin*, 897 So. 2d at 209. In response, the Alabama Credit Union Administration ordered FSCU to conduct an investigation of the improprieties. *Id.* FSCU retained a law firm to conduct the

investigation, which in turn retained Jo Lynn Rutledge, a certified public accountant. *Id.* As part of the investigation, various employees told Rutledge that Karen Brackin, an FSCU employee at the time, had instructed employees to change due dates on loans and make other changes to loan documents. *Id.* at 210. Eventually, Brackin sued FSCU on various theories, one of them being defamation based on FSCU employees' disclosures of information about Brackin to Rutledge. *Id.* at 215.

The Supreme Court of Alabama held that no publication of the statements occurred when the employees gave the information to Rutledge. *Id.* at 221. This was so, the court reasoned, because Rutledge was retained by FSCU and the law firm to conduct the investigation. So the information that the employees gave Rutledge fell within the scope of the agency relationship between FSCU and Rutledge. "[T]he employees' communications to Rutledge did not amount to 'publications' to a third party for purposes of establishing a defamation claim." *Id.* at 222.

In his brief, Davis attempts to distinguish *Brackin* by pointing out that the investigation there was ordered by the state regulatory agency. True, but that is legally irrelevant to the fact that an agency relationship between Rutledge and FSCU existed. And that relationship, as we have explained, served as the basis for the Court's decision.

Davis also argues that the district court erred by conflating a "consultant" relationship with an agency relationship, and he contends that the district court should have applied traditional

agency principles to determine whether Mowery was truly acting as LSA's agent or rather, as an independent contractor. In Davis's view, LSA can claim that giving Mowery the documents was not publication only if Mowery was LSA's employee.

We are not persuaded. Being an "agent" and being an "independent contractor" are not necessarily mutually exclusive. One can be in an agency relationship with another without being that person's employee. See Brown By & Through Brown v. Com. Dispatch Publ'g Co., 504 So. 2d 245, 246 (Ala. 1987) (emphasizing that "test of agency is the right of control," not simply employer-employee relationship); see also 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1251 (10th Cir. 2013) ("[A]n independent contractor can be an agent. An agent need not be an employee."). Indeed, the Alabama Supreme Court held that Rutledge was an "agent" of FSCU for publication purposes, even though Rutledge was not FSCU's employee. See Brackin, 897 So. 2d at 222. If Davis were correct, employers could not hire consultants and experts to assist them in human-resources matters. Otherwise, they would risk defamation liability every time they hired outside consultants, investigators, and advisors and provided them with the information they needed to do their jobs.

For these reasons, the district court correctly held that LSA's provision of the Resolution and Suspension Letter to Mowery did not constitute publication for purposes of a defamation claim under Alabama law.

## C. We lack jurisdiction over Defendants' cross-appeal

In their cross-appeal, Defendants point out that the district court was silent as to the award of costs under Federal Rule of Civil Procedure 54(d). Based on this circumstance, Defendants argue that the district court erred by denying them costs without stating a basis for doing so. In Defendants' view, they are entitled under Rule 54(d)(1) to their costs because the district court made no findings of misconduct by Defendants that would justify any sanction. But Defendants do not mention in their brief the bill of costs they filed after the district court entered the final judgment and Davis filed his notice of appeal.

In the absence of circumstances not present here, an appellate court's jurisdiction is limited to appeals of final decisions. 28 U.S.C. § 1291; *Fort v. Roadway Exp., Inc.*, 746 F.2d 744, 747 (11th Cir. 1984). But a district court's decision regarding costs is not final until the amount is fixed. *See Mekdeci v. Merrell Nat'l Lab'ys*, 711 F.2d 1510, 1523 (11th Cir. 1983) (finding lack of jurisdiction to review a district court's order that it intended to award costs but had yet to fix the amount).

Federal Rule of Civil Procedure 54(d)(1) states that unless a federal statute, the Federal Rules, or a court order provides otherwise, costs should be allowed to the prevailing party, and the court clerk "may tax costs on 14 days' notice." The Middle District of Alabama's Local Rule 54.1 directs that requests for taxation of costs under Rule 54(d) shall be filed with the clerk within 35 days of entry of final judgment.

20-12886                Opinion of the Court                    19

Here, Defendants' cross-appeal is premature because the judgment, while final as a general matter, was not a final decision on costs, and the district court has not acted on the bill of costs Defendants filed after judgment. A district court is not required to address costs in its judgment, and silence is not somehow an implicit denial of costs. To the contrary, Local Rule 54.1 contemplates that the prevailing party will not even seek costs until after the district court enters final judgment. Because the judgment from which the Defendants cross appeal is not final as to the costs issue—the sole subject of their appeal—we lack jurisdiction over the cross-appeal and therefore dismiss it.

## IV.

For the foregoing reasons, the judgment of the district court is affirmed, and the cross-appeal is dismissed.

**AFFIRMED; CROSS-APPEAL DISMISSED.**