[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-13930

Non-Argument Calendar

_____

DONALD CLARK WRIGHT, III,

Plaintiff-Appellee,

*versus*

BRANDON WARREN,
in his Individual and Official Capacity,

Defendant-Appellant,

VICTOR HILL,

in his Individual and Official Capacity,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

D.C. Docket No. 1:21-cv-05197-MHC

_____

Before BRANCH, LAGOA, and ANDERSON, Circuit Judges.

PER CURIAM:

This case is about a routine traffic stop gone wrong.  On Christmas Eve 2019, Deputy Brandon Warren of the Clayton County Sheriff's Office pulled over Donald Clark Wright III after a search of Wright's vehicle tags indicated that Wright had outstanding arrest warrants.  While Deputy Warren was outside his police cruiser, Wright sped off in his truck, prompting Deputy Warren to engage Wright in hot pursuit.  Wright's truck eventually spun out and crashed into a curb, rendering it inoperable.  Deputy Warren caught up to Wright and approached the truck on foot with his service weapon drawn.  Upon seeing Deputy Warren, Wright—who was unarmed—exited the truck and ran away toward a nearby tree line, coming upon a fence.  As Wright prepared to jump over the fence, Deputy Warren fired several shots at Wright, striking him once in the buttocks.

Wright sued Deputy Warren, alleging that the shooting amounted to an excessive use of force in violation of the Fourth and Fourteenth Amendments.  At summary judgment, the district court denied Deputy Warren qualified immunity, finding that a

reasonable jury, viewing the record evidence in the light most favorable to Wright, could find that Deputy Warren's use of deadly force against Wright was objectively unreasonable under clearly established law.

Deputy Warren now seeks interlocutory review of the denial of qualified immunity. *See* 28 U.S.C. § 1291; *English v. City of Gainsville*, 75 F.4th 1151, 1155 (11th Cir. 2023). After careful review, we conclude that Deputy Warren is not entitled to qualified immunity and affirm the district court's denial of summary judgment.

## I.     BACKGROUND

### A.     Factual Background

On December 24, 2019, Donald Clark Wright III was driving southbound on I-75 in Georgia on his way to his family's home for Christmas. At some point, Deputy Brandon Warren of the Clayton County Sheriff's Office pulled behind Wright's truck in his police cruiser. Deputy Warren decided to run the truck's tags and the associated driver's license number, revealing that Wright had outstanding arrest warrants for "criminal attempt to commit a vehicle theft, criminal damage to property, [and] pointing a gun at another." Deputy Warren followed Wright off the highway to a gas station. After Wright came to a stop in the back of the parking lot, Deputy Warren activated the emergency blue lights on his cruiser and called in his location.

Deputy Warren approached Wright's truck and asked to see Wright's driver's license. Wright replied that he did not have his

license on him but told Deputy Warren his first name, which matched the name on the warrants.  To stall while he waited for backup, Deputy Warren told Wright that the tint on his vehicle windows appeared too dark and that he wanted to test it for compliance.  As Deputy Warren walked back to his cruiser to retrieve a tint meter, Wright suddenly sped out of the parking lot, back onto the road.  Deputy Warren quickly jumped into his cruiser to pursue Wright.  Throughout the chase, Wright drove at a high rate of speed and crossed onto the wrong side of the road to bypass traffic.  Deputy Warren lost sight of Wright's truck at least once during the chase.  While driving up a hill, Wright lost control of his truck and crashed into a curb near an elementary school and a church.

Deputy Warren caught up to Wright's now-totaled truck and exited his cruiser.[1]    Realizing that the truck was now

---

[1] From this point on, the parties' accounts of the facts differ drastically.  Under his version of events, Deputy Warren, upon catching up to Wright's truck, exited his cruiser and positioned himself "[o]n the front quarter panel of the driver's side" with his service weapon drawn.  From this vantage, Deputy Warren observed Wright rummaging through his truck for something, although he could not see Wright's hands.  Deputy Warren began shouting at Wright to show his hands.  Wright "abruptly" exited the truck with his back toward Deputy Warren and reached inside his vehicle.  According to Deputy Warren, Wright then "extend[ed] his arm [in] an outward motion" holding "a black and silver firearm," prompting Deputy Warren to fire four shots.

What actually occurred in that moment "may or may not be" as Deputy Warren describes.  *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1264 n.1 (11th Cir. 2021).  But, because we must "view the evidence and draw all reasonable inferences from it in the light most favorable to the nonmoving party" at summary judgment, *id.*, these facts are irrelevant to the extent they conflict

inoperable, Wright grabbed his iPhone—which was in a black case—and AirPods and hopped out of the truck to continue fleeing on foot. Wright was not armed and held nothing else in his hands. As he exited the truck, Wright saw Deputy Warren approaching him from about 15 to 20 feet away with his service weapon drawn. Deputy Warren testified he shouted several times at Wright, "Hands, hands, show me your hands," but Wright never heard those commands. Regardless, Deputy Warren was able to see Wright's hands when Wright exited the truck.

Wright ran around the front door of his truck and towards the woods, never looking back to face Deputy Warren. Wright came upon a fence, which he intended to jump over. But, when Wright was "a couple strides" away from the fence, Deputy Warren fired at least four shots at Wright, with one striking him in the buttocks.

Despite having just been shot, Wright "continued to run with all [his] heart" through the woods, people's backyards, and the street. Deputy Warren did not pursue Wright any further after Wright hopped the fence. However, after unsuccessfully trying to call an Uber to pick him up, Wright eventually surrendered to the barrage of police officers that had swarmed the scene. The officers

---

with Wright's version of events, *see Buending v. Town of Redington Beach*, 10 F.4th 1125, 1130 (11th Cir. 2021) ("If the record presents disputed issues of fact, the court may not decide them; rather, [it] must deny the motion and proceed to trial." (quoting *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012))).

arrested Wright and took him to the hospital to treat his wounds. Wright was later charged with counts for "fleeing from police officer, reckless driving, improper lane change, striking fixed object – hit and run, and misdemeanor obstructing an officer."

## B.    Procedural History

On December 21, 2021, Wright sued Deputy Warren and Clayton County Sheriff Victor Hill, in their individual and official capacities, in the U.S. District Court for the Northern District of Georgia, alleging they violated his right to be free from an unlawful seizure under 42 U.S.C. § 1983 and the Georgia Constitution. Wright also brought a state-law claim for battery against Deputy Warren.

The Defendants moved to dismiss the complaint, arguing that they were immune from suit on all counts. The district court agreed that sovereign immunity barred Wright's official-capacity claims against Deputy Warren, and that the state-law individual-capacity claims failed under Georgia's official-immunity doctrine. The district court also held that Wright did not state a viable § 1983 claim against Sheriff Hill in either his individual or official capacity, as the complaint failed to plausibly allege that Sheriff Hill committed a constitutional violation. However, the district court rejected Deputy Warren's argument that he was entitled to qualified immunity on Wright's § 1983 excessive-force claim (in his individual capacity), concluding that Wright "stated a claim that it was unreasonable for Warren to believe that deadly force was necessary to prevent his escape."

Following discovery, Deputy Warren moved for summary judgment on the remaining § 1983 claim, once again asserting the defense of qualified immunity. The district court denied summary judgment, finding that there remained "a genuine issue of material fact underlying whether Warren's use of force was reasonable" under clearly established law. Deputy Warren timely appealed the denial of qualified immunity on that claim.

## II.    STANDARD OF REVIEW

We review a district court's denial of summary judgment on qualified immunity grounds *de novo*. *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011). In doing so, we review all evidence and factual inferences "in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004).

## III.    ANALYSIS

Deputy Warren asserts that he is entitled to qualified immunity on Wright's remaining excessive-force claim. Qualified immunity protects officers engaged in discretionary functions from civil liability under § 1983 "only if the officers' actions do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To invoke this defense, the officer must first show that he was "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Spencer v.*

*Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). If the officer makes that showing, "the burden shifts to the plaintiff to show that the official's conduct (1) violated federal law (2) that was clearly established at the relevant time." *Id.* To qualify as "clearly established," a legal principle "must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Bradley v. Benton*, 10 F.4th 1232, 1242 (11th Cir. 2021).

It is undisputed that Deputy Warren was acting within the scope of his discretionary authority when he shot Wright. *Cf. Hunter v. City of Leeds*, 941 F.3d 1265, 1278 n.16 (11th Cir. 2019) ("The pursuit and apprehension of suspected criminals is a core discretionary function of the police." (citing *Crenshaw v. Lister*, 556 F.3d 1283, 1289–90 (11th Cir. 2009))). Accordingly, we must decide whether Wright has established that (1) Deputy Warren's use of deadly force was unconstitutionally excessive under the Fourth Amendment, and (2) that "every objectively reasonable government official facing the circumstances would know that" such force was unlawful. *Bradley*, 10 F.4th at 1242. We consider each prong of the qualified-immunity analysis in turn.

## A.

The Fourth Amendment's proscription against unreasonable seizures protects one's right to be free from excessive force during an arrest or other seizure by a state officer. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Torres v. Madrid*, 592 U.S. 306, 318

(2021) (recognizing that an intentional shooting by police constitutes a Fourth Amendment seizure "the instant that the bullets str[ike]" the target). Excessive force claims are governed by the Fourth Amendment's "objective reasonableness" standard, which asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

The reasonableness of the officer's conduct must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396; *see also Carr v. Tatangelo*, 338 F.3d 1259, 1269 (11th Cir. 2003) ("A reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983."). Once we have "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of the officer's actions is a pure question of law." *Penley v. Eslinger*, 605 F.3d 843, 848–49 (11th Cir. 2010).

The Eleventh Circuit has recognized that a police officer generally may use deadly force without violating the Fourth Amendment when the officer:

> (1) 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm'; (2) reasonably believes that the use of deadly force was necessary to prevent escape;

> *and* (3) has given some warning about the possible use
> of deadly force, if feasible.

*McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (quoting *Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003)) (emphasis in original).

However, these are not "rigid preconditions" for the lawful application of deadly force, but rather factors we consider "to aid our effort to 'slosh . . . through the factbound morass of [this] reasonableness' analysis." *Penley*, 605 F.3d at 850 (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)); *cf. Powell v. Snook*, 25 F.4th 912, 922 (11th Cir. 2022) ("[W]e 'have declined to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing.'" (first quoting *Penley*, 605 F.3d at 854 n.6; then citing, *Tatangelo*, 338 F.3d at 1269 n.19)).

Deputy Warren argues that his use of deadly force was reasonable because he believed Wright was armed, knew of Wright's past violent arrests, had just engaged in a high-speed chase with him, and saw Wright continuing to flee into a residential neighborhood. Taking the evidence in the light most favorable to Wright, however, we conclude that no reasonable officer on the scene would agree.

To begin, it was simply not reasonable for Deputy Warren to think he was in danger of immediate harm at the time of the shooting. At the heart of Deputy Warren's qualified-immunity defense is the claim that he "reasonably believed Wright was holding a gun," rather than (as we now know) a black iPhone and AirPods.

23-13930                Opinion of the Court                11

According to Deputy Warren, it was reasonable for him to think that Wright had a gun because, as Wright testified, Deputy Warren was able to see Wright's hands as Wright exited his truck. Two competing inferences can be drawn from the fact that Deputy Warren saw Wright's hands "from 15 to 20 feet" before Wright fled into the woods: (1) that Deputy Warren had sufficient opportunity to discern that Wright was not holding a gun, or (2) that Deputy Warren did not see Wright's hands long enough to dispel his belief that the iPhone was a gun. Under the former scenario, it would not be reasonable to think Wright was armed. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). And because we must draw all reasonable inferences in Wright's favor at summary judgment, *see Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997), that is the scenario we must adopt.

In any event, "the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit." *Perez*, 809 F.3d at 1220. Instead, "the ultimate determination depends on the risk presented," "with emphasis on the level and immediacy of that threat." *Id.* (citing *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013)).

Here, Deputy Warren was not required to make "a split-second judgment" to shoot Wright in order to avoid "an imminent threat of violence." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) (quotation omitted). When Deputy Warren first pulled the trigger, Wright was already running away—at no point turning around to reengage. Deputy Warren was

"neither threatened by a weapon, nor appeared to be threatened by a weapon, nor [was] fired upon, but rather . . . without provocation shot at a nondangerous suspect." *Lundgren v. McDaniel*, 814 F.2d 600, 602 (11th Cir. 1987). Instead, he shot Wright in the back while Wright was fleeing; deadly force is not reasonable in such circumstances. *See, e.g.*, *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005) (finding deadly force unreasonable where there was "no indication that [the suspect] made any threatening moves toward the police"); *Bradley*, 10 F.4th at 1244 (same where fleeing suspect "never tried to harm any of the officers, nor did he make any threatening movements or gestures").

The use of deadly force was also not needed to protect others from imminent violence, as no reasonable officer would believe Wright presented an "immediate" threat to anyone else "at the time of the shooting." *Vaughan*, 343 F.3d at 1330. As Deputy Warren testified, no other people were in the "general area" at the time of the shooting. And no evidence suggests that there was anyone in the nearby church or school either.

Deputy Warren nonetheless argues that it was reasonable to think that Wright posed a danger to the inhabitants of the surrounding residential area given Wright's past arrest for "pointing a gun at another" and his "reckless attempts to avoid arrest." True, "deadly force is more likely reasonable if . . . the suspect committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public." *Penley*, 605 F.3d at 850 (internal quotation

omitted).   However, to the extent Wright's evasive driving may have threatened the safety of other motorists,[2] that threat largely subsided when Wright exited his inoperable truck and ran away on foot.  *See Glasscox v. City of Argo*, 903 F.3d 1207, 1215 (11th Cir. 2018) (explaining the "severity" of threat posed by reckless driving "carries little weight" once the suspect is "no longer engaged" in that conduct).

That Wright resisted arrest—without ever resorting to violence—"is not enough to justify the use of deadly force" either. *Cantu v. City of Dothan*, 974 F.3d 1217, 1230 (11th Cir. 2020).  Wright, viewing the facts in the light most favorable to him, was merely "evading arrest . . . in an attempt to avoid capture," and gave no indication that he was primed to commit any violence at any time. *Vaughan*, 343 F.3d at 1330.  Moreover, Deputy Warren's assessment that Wright posed an immediate threat to the public because Wright apparently was "willing to threaten others with a gun before" is the very sort of unreasonable speculation that qualified immunity does not reach—especially since, under Wright's version of the facts, Deputy Warren "had no reason to believe" Wright was armed.  *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015); *see also*

---

[2] Wright objects to Deputy Warren's testimony that Wright drove "in reckless disregard for the safety of others" as an improper statement of opinion.  However, Wright offers no evidence to rebut Deputy Warren's factual assertions that Wright was "driving on the wrong side of the road" and "going around vehicles" in his attempt to flee.

*United States v. Satterfield*, 743 F.2d 827, 845 (11th Cir. 1984) ("[A] remote eventuality is not the type of circumstance that creates an urgent need for immediate action."); *Long v. Slaton*, 508 F.3d 576, 586 (11th Cir. 2007) (Forrester, J., concurring in part and dissenting in part) (arguing deadly force is not reasonable where "the possibility that a nonviolent fleeing felon will later pose a threat of physical harm to others is remote and highly speculative").

We also think it would have been "feasible" for Deputy Warren to issue a warning before shooting to kill. *Powell*, 25 F.4th at 922. This is not a case where there was "little or no time or opportunity for [the officer] to warn [the suspect]" prior to shooting because deadly force was "immediately" necessary "to protect . . . others from a threat of serious physical harm." *Cantu*, 974 F.3d at 1231. Given that Wright was running away from Deputy Warren—the only other person in the vicinity—"a reasonable officer would not have believed that [he] was compelled to use deadly force immediately . . . [and] would have known to hold off doing so until [he] had given a warning." *Id.*

Accordingly, we hold that a reasonable jury could find the disputed facts in Wright's favor and determine that it was unreasonable for Deputy Warren to shoot Wright as he fled. We thus conclude that Wright has established a violation of the Fourth Amendment.

## B.

We must now decide whether it would have been clear to an objectively reasonable officer that shooting Wright as he fled was

unlawful. *Vaughan*, 343 F.3d at 1332. A right is considered to be "clearly established" only if "the state of the law [at the time of the violation] gave the defendants 'fair warning' that their alleged conduct was unconstitutional." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). To make this showing, a plaintiff must "point to either (1) 'case law with indistinguishable facts,' (2) 'a broad statement of principle within the Constitution, statute, or case law,' or (3) 'conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)).

By the time Deputy Warren pulled the trigger on December 24, 2019, it had long been established in our Circuit that "[u]sing deadly force, without warning, on an unarmed, retreating suspect is excessive." *Salvato*, 790 F.3d at 1294 (citing *Garner*, 471 U.S. at 1). Moreover, the "particularized facts" from which that principle arose, *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002), are "materially similar" to the facts of this case, *Bailey v. Wheeler*, 843 F.3d 473, 484 (11th Cir. 2016).

In *Tennessee v. Garner*, the Supreme Court held it was unreasonable for an officer to shoot a fleeing suspect who—like Wright—was unarmed, running away with his back turned, and trying to scale a fence when he was hit. *See* 471 U.S. at 3–4, 11. According to the Court, the use of deadly force under such circumstances was excessive because the officer "did not have probable cause to believe that [the suspect] . . . posed any physical danger to

himself or others." *Id.* at 21. So too here. As we have already explained, no reasonable officer could have viewed Wright as a threat, meaning that Deputy Warren's decision to shoot Wright violated *Garner*'s clearly established proscription against using deadly force to neutralize unarmed fleeing suspects.

Resisting this conclusion, Deputy Warren says *Garner* is distinguishable because, in that case, the officer was "reasonably sure" the fleeing suspect was unarmed, while Deputy Warren believed Wright had a gun. But, under Wright's view of the facts, a jury could find that belief to be unreasonable. "Restated in Fourth Amendment terms, this means [Deputy Warren] had no articulable basis to think [Wright] was armed." *Garner*, 471 U.S. at 20. And since *Garner* held that it is unreasonable to shoot a fleeing suspect from behind when that is the case, *see id.* at 21–22, we conclude that it is "beyond debate" that Deputy Warren had "fair warning that his conduct violated the law," *Gates v. Khokar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (citations omitted). Therefore, Deputy Warren is not entitled to qualified immunity.

## IV.    CONCLUSION

For the reasons stated, we affirm the district court's denial of summary judgment.

**AFFIRMED.**